262 So.2d 339

**Theodora Milloit POOLE and Weldon W. POOLE, Plaintiffs-Appellees-Respondents,**

v.

**William J. GUSTE, Jr. and Roy F. GUSTE Defendants-Appellants-Relators.**

**No. 51422.**

May 1, 1972.

Rehearing Denied June 5, 1972.

apply according to the actual circumstances.

William McM. King, Covington, for defendants-applicants.

Robert L. Kleinpeter, Baton Rouge, Marian Mysing Livaudais, F. Pierre Livaudais, Covington, for plaintiffs-respondents.

TATE, Justice.

The essential issue concerns the plaintiffs', the Pooles', claim that their estate enjoys a servitude of drain into and through a canal which is on the adjacent property of the defendants, the Gustes.

The Gustes built levees which both previous courts found prevented the flow of the surface water from the Poole property into the canal on the Guste property. Upon finding that the Poole estate was owed a servitude of drain by the Guste estate, the trial court issued a mandatory and prohibitory injunction ordering the defendants Guste to cease obstructing the drainage and to remove their levees in two places. The court also awarded damages. The court of appeal affirmed. 246 So.2d 353 (1971).

We granted certiorari, 258 La. 760, 247 So.2d 861 (1971), primarily because we felt that the case might present significant issues as to the modification, Civil Code Articles 752, 795, of a natural servitude of drain, Civil Code Article 660, and as to the creation of a conventional servitude of drain by either the ten- or the thirty-year acquisitive prescription, Civil Code Articles 765, 3504. Under the present facts and pleadings, however, these issues are not presented by this litigation. The issues remain principally factual and, as we shall note, were correctly resolved by the previous courts.

As the excellent analysis of the evidence by the previous courts shows in more detail, the preponderant evidence proves the following relevant facts:

1. The parties own adjacent tracts of land.[1] Relevantly to present purposes, the Pooles (plaintiffs) own Section 30, and the Gustes (defendants) own Section 29. The Poole Section 30 is west of the section line boundary, and the Guste Section 29 east of it.

2. In 1916, by agreement of the ancestors in title of the parties, the "Dendinger

---

1. The Guste tract includes about 5000 acres and is being developed for intensive-cultivation agricultural purposes. The Poole tract includes about two thousand acres. Its principal use in the area of present interest is for the growing of timber on "pine islands", naturally elevated portions of the property. The Poole complaint is that the interference with drainage of these islands has adversely affected the production of timber.

Canal" was constructed, approximately 30 feet wide and 6 or 7 feet deep. Pertinently to present purposes, it is situated in the Guste land, just east of the section line between Section 30 (Poole) and Section 29 (Guste). This north-south canal empties at its south end into the Main (or Bedico) Canal. The latter flows east-west and empties into streams which eventually flow into Lake Pontchartrain, which is 1 to 2 miles below the present tracts.

3. Prior to the construction of the Dendinger Canal, the natural drainage of the surface waters on the portion of the Poole tract in Section 30 was southeasterly into and across the Guste property in Section 29. This drainage was of rainwater, other waters draining onto the Poole property from the north, and tidal overflow water. (The latter, at high tide, after the Canal was built, flowed onto the Poole land from the south (through the Dendinger Canal) and from the west (from a natural creek.) When the tide ebbed, the waters then drained southeasterly from the Poole land into the Dendinger Canal.[2]) As the trial court noted, a reasonable inference from the evidence is that much of this pre-Canal drainage occurred at a draw or natural drain at a place we designate as the

"bridge site". (This place of drain is more particularly designated in the trial court judgment.)

4. The Dendinger Canal was constructed in accordance with a written agreement in 1916 by the ancestors in title of both parties. By this agreement, the canal was constructed within Section 29 (Guste) for the purposes of affording the Pooles' predecessor in title (Dendinger) the free use of the canal to transport timber down the canal for a period of (only) ten years, i. e., until 1926. The evidence further shows that this agreement was not renewed and that, in fact, the predecessor owner of the Poole estate ceased using the the canal for timber-floating purposes after 1924. From 1924 on, the sole function of the canal was for drainage purposes (aside from its occasional use for fishing and recreation by members of the public).

5. After the construction of the Dendinger Canal in 1916, the principal change in drainage was that surface waters from the Poole tract flowed into and down the canal instead of *across* the surface of the Guste land. The drainage into the Dendinger Canal occurred principally at the place called the "bridge site" or "the gap".[3]

---

2. The excess waters from the west, forced over ridges in the Poole property at high tide, could not return westerly because of the ridges.

3. The trial court injunction ordered the Guste levee opened at the site of this former gap, and it further ordered the

south end of the Dendinger Canal opened so that water flowing into the Dendinger Canal could flow out of it into the Main (Bedico) Canal. As the text of the opinion shows, both of these openings were closed by the defendants when they constructed their levee.

(When the Dendinger Canal was dug, the dirt was thrown on the west bank of the canal, forming a "spoil bank". When the canal was constructed, a gap was left in this spoil bank; when a road was constructed on top of the spoil bank, a bridge was built at this gap. The gap left a clear avenue of drainage from the Poole property into the Dendinger Canal, the spoil bank preventing southeasterly drainage formerly occurring at other places along the boundary section line.) .

6. In 1965, the defendants (who had purchased the property in 1959) constructed a 7' high, north-south levee along the section line between Sections 29 and 30 (i. e., between the Poole property and the Dendinger Canal). This levee used the old spoil bank as a base; but, in constructing the levee, the Gustes filled in the gap at the bridge site through which water had formerly drained from the Poole land, thus completely blocking off the latter's property from the Dendinger Canal. (Actually, in building the levee, the Gustes constructed it partially on Poole property.)

The Dendinger Canal remained, but the Gustes now use it as part of their internal drainage system for the improvement of

their tract for use in intensive agricultural cultivation. A levee was also constructed across the south end of the Dendinger Canal, closing it off where it had formerly emptied into the Main (Bedico) Canal.[4] (The Gustes did so in order to prevent the tidal flow of water from that canal into their property. A new interior canal was dug was just inside of and parallel to this south levee to facilitate the internal drainage of this improved tract:)

▬ Under the well-supported findings of fact by the trial and intermediate courts, these courts correctly found that the estate of the plaintiffs Poole enjoys a servitude of drain onto the estate of the defendants Guste and through it (via the Dendinger Canal) to the Main (or Bedico) Canal to the south of both properties, . The servitude due by the Guste estate to the Poole estate is in part a natural servitude of drain, Civil Code Article 660, and in part a "conventional" servitude of drain acquired by acquisitive prescription,[5] Civil Code Articles 709 and 765 *or* 3504.

4. The trial court injunction ordered the new levee opened at this point, too. See Footnote 3.

5. Our Civil Code classifies predial (or "landed" or "real") servitudes, Article 646, as (see Article 659) 1. "natural" (arising from the natural situation of places, Article 660–663). 2. "legal"

(specific obligations imposed by law, Articles 664–708), and 3. "conventional" (or "voluntary", i. e. one growing out of an act or inaction of man, Articles 709–822). See Planiol, Civil Law Treatise, Volume 1, Section 2891 (Law Institute translation, 1959). A servitude acquired by prescription is, technically, a "conventional" servitude because its creation is governed by the provisions of the chapter entitled "Of Conventional or Voluntary Servitudes". Articles 709, 765. See Yiannapoulos, Predial Servitudes, 29 La.L.Rev. 1, 43 (1968).

A *natural* servitude of drain is due by a servient (or "below") estate to receive the waters which run naturally from a dominant (or "above") estate, Civil Code Article 600.[6] A *conventional* servitude of drain (the right "of passing water *collected in pipes or canals* through the estate of one's neighbor", Article 714) may be created by contract, Article 709, or, being continuous[7] and apparent,[8] may be acquired by prescription.[9]

In the present case, the Poole estate is owed a conventional servitude of drain onto the Guste estate at the bridge site and through the Dendinger Canal on the Guste property. This results from drainage into the canal at this point, and the canal's use

for this purpose without title, for a period well in excess of thirty years before the construction, in 1965, of the Guste levees which obstructed the Poole drainage into and through the Guste estate. This servitude was, at the least, acquired by the thirty-years' acquisitive prescription provided by Article 3504 (quoted in Footnote 9).

In so holding, we expressly do *not* determine:

(1) Whether the period of thirty years' prescriptive use necessary for acquisition under Article 3504 commenced in 1916, when the canal was first used for drainage purposes (although expressly created for timber-floating purposes *only*),[10] or instead

---

6  Civil Code Article 660 provides:
   "It is a servitude due by the estate situated below to receive the waters which run naturally from the estate situated above, provided the industry of man has not been used to create that servitude.

   "The proprietor below is not at liberty to raise any dam, or to make any other work, to prevent this running of the water.

   "The proprietor above can do nothing whereby the natural servitude due by the estate below may be rendered more burdensome."

7. See Civil Code Article 727:
   " *  *  *  Continuous servitudes are those whose use is or may be continual without the act of man. Such are aqueducts, *drain*, view and the like. *  *  * "
   (Italics ours.)

8. See Civil Code Article 728:
   " *  *  *  Apparent servitudes are

such as are to be perceived by exterior works such as a door, a window, an aqueduct *  *  * " and such as a *canal*.

9. See Civil Code Article 765:
   "Continuous and apparent servitudes may be acquired by title, or by a possession of ten years. *  *  * "
   See Civil Code Article 3504:
   "A continuous apparent servitude is acquired by possession and the enjoyment of the right for thirty years uninterruptedly, even without a title or good faith."
   See also: Levet v. Lapeyrollerie, 39 La.Ann. 210, 1 So. 672 (1887); Wild v. LeBlanc, 191 So.2d 146 (La.App.3d Cir. 1966); Hale v. Hulin, 130 So.2d 519 (La.App.3d Cir. 1962). Cf., Acadia Vermillion Rice Irrigating Co. v. Broussard, 175 So.2d 856 (La.App.3d Cir. 1965), noted 40 Tul.L.Rev. 397.

10. There is French authority that, when a servitude is accorded by title, the owner of the dominant estate may neverthe-

in 1926, when the contractual right of the Poole estate to use the canal (i. e., for timber-floating purposes) terminated;[11]

(2) Whether the conventional servitude acquired by prescription might, also, have been acquired under Article 765 by the

ten-years' simple unopposed and uninterrupted use following termination of the timber-floating servitude in 1926, see Levet v. Lapeyrollerie, 39 La.Ann. 210, 1 So. 672 (1887) and decisions cited in Footnote 9, or whether, since use was without title,

less claim a different or more extensive servitude by its possession of thirty years or more. (The possession of a servitude is, generally, the *"use"* made of the servitude. Civil Code Article 743 and interpretative jurisprudence, such as John T. Moore Planting Co. v. Morgan's Louisiana & T. R. & S. S. Co., 126 La. 840, 53 So. 22 (1910).) See 2 Toullier, Droit Civil Français (1833 edition) (Italics ours.) :

P. 186: *"Possession of a servitude of drain commences on the day in which the necessary works for the qualification of the right and for its exercise are completed.* It does not suffice that, since time immemorial, the waters originating in the estate above pass into the estate below. This natural flow does not presuppose, does not establish any right, other than that directed against the owner of the lower estate to receive the waters.

"But if he makes, either on his own estate, or in the estate above, apparent works destined to facilitate the flow and the course of these waters in order to render them useful for his property, these works manifest an intention to acquire a right, and the prescription begins to run from the day the works are completed. And, if possession has been continued without interruption for thirty years, a servitude has been acquired."

P. 206: "If I enjoyed a more extensive right than that accorded to me by title, if I have done more than what I was allowed to do, I have in all cases preserved my right: the more is included in the less. But I have not prescribed for the more, and I may be always forced to decrease the use of the servitude, *un-*

*less the servitude is continuous and apparent, prescriptible without title."*

P. 107: "If my title gives to me the right to draw water during the night only, and I used it during the day only, my right has prescribed; and I did not acquire the right to draw water during the day, because the servitude is discontinuous. . . . But if, instead of a right to draw water there was an acqueduct, or any other continuous and apparent servitude, by losing the right limited by my title, *I would have acquired another right by possession of thirty years."*

Cf., Civil Code Article 797 (quoted in Footnote 11) which might be interpreted to mean that the owner of a servitude cannot acquire prescriptive title for more extensive use than justified by the title, *except* in the case of a continuous apparent servitude (such as the present); also, Article 800.

11. Cf., Civil Code Article 736 (one using a servitude pursuant to title cannot avail himself of prescription). See also Civil Code Articles 790 and 791 (which, although speaking of prescriptive extinguishment through non-usage, refer to acts *"contrary* to the servitude" as indicating non-use thereof) and Civil Code Article 797: "If he to whom a servitude is due enjoys a right more extensive than that which is given him by the act establishing the servitude, he will be considered as having preserved his right of servitude; because the less is included in the greater.

"But he can not thus prescribe for the surplus, and can be compelled to confine himself to the exercise of the servitude granted by his title, unless it be a continuous apparent servitude, which he has acquired by prescription.'"

thirty years' acquisitive use under Article 3504 was required,[12] Comment, Acquisitive Prescription of Servitudes, 15 La.L.Rev. 777 (1955);[13]

(3) To what extent the servitude of drain from the Poole property onto the Guste estate at the bridge site is a natural servitude of drain under Article 660 (being the use of a natural drain—which, at least before the Dendinger Canal spoil bank, was not created by the industry of man—) through which surface waters were passed onto the Guste estate, not increased in volume (although some waters were perhaps diverted into drainage at that point rather than at others nearby), Nicholson v. Holloway Planting Co., 255 La. 1, 229 So.2d 679 (1969), Broussard v. Cormier, 154 La. 877, 98 So. 403 (1923); and to what extent, if any, such more burdensome use of the natural servitude of drain exceeded or was contrary to it, Articles 660, 790, Planiol, Civil Law Treatise, Volume 1, Section 2903 (Louisiana State Law Institute Translation, 1959), so as to alter it or substitute for it a conventional servitude created by acquisitive prescription, Articles 765, 790, Johnson v. Wills, 220 So.2d 134 (La.App.3d Cir. 1969), certiorari denied 254 La. 132, 222 So.2d 883 (1969), noted 30 La.L.Rev. 192–93 (1969).

We should at this point note that we find no support in the Civil Code, the jurisprudence, or the commentators for the contentions of the defendants Guste (a) that the timber-floating servitude of 1916 cannot be enlarged beyond its original use by acquisitive prescription, nor that (b) the Poole land cannot be the dominant estate and the Guste property the servient estate unless we find that overall (i. e., as between the 5000-acre Guste tract and the 2000-acre Poole property), irrespective of individual patterns along particular points of the boundary, one estate is upper to the other.[14]

12. But see Kennedy v. Succession of McCollam, 34 La.Ann. 568 (1882) (good faith use without title is all that is required).

13. If the cited *Kennedy* decision (Footnote 12) is correctly decided, it may well be that the thirty-year prescription of Article 3504 is reserved for bad-faith use of continuous, apparent servitudes without any title at all, or for prescriptive acquisition of such servitudes by use more extensive than that granted by a contractual servitude, see Footnote 10.

14. In making the (b) contention, the Gustes point out that in the northern parts of the two estates some of the Guste waters drain onto the Poole properties. This water is eventually drained back onto the Guste property at the bridge site. As the trial court noted: "The relevant question is which way the water ultimately left the Poole property". Since the water drained from the Poole land through the gap at the bridge site into the Dendinger Canal, the Poole estate enjoyed a servitude of drain onto the Guste land at that point, as previously held. See also Civil Code Article 746, which recognizes that reciprocal conventional servitudes may exist between two estates; likewise, by analogy, so may reciprocal natural servitudes.

█ Having found the Poole estate is due a servitude of drain by the Guste estate, the previous courts correctly held the plaintiffs Poole, as owners of the dominant estate, to be entitled to injunctive relief requiring the defendants Guste, as owners of the servient estate, to remove the obstacles they had erected to the drainage of waters from the dominant through the servient estate. Articles 660, 777. See Sowers & Jamison v. Shiff, 15 La.Ann. 300 (1860); Leonard v. Kleinpetre, 7 La.Ann. 44 (1852); Hays v. Hays, 19 La. 351 (1842); Johnson v. Wills, 222 So.2d 134 (La.App. 3d Cir. 1969), certiorari denied 254 La. 132, 222 So.2d 883 (1969).

The trial court thus correctly granted a mandatory injunction ordering the Gustes to remove their levees at (1) the bridge site leading from the Poole tract onto the Guste tract and (2) at the south end or mouth of the Dendinger Canal (since otherwise the Dendinger Canal would not drain the Poole property as before.) [15]

The defendant Gustes further contend that, even if the Poole property is due a servitude of drain by the Guste estate, the plaintiff Pooles are not entitled to the equitable remedy of injunctive relief. The defendants' argument is based upon limitations to the remedy of equity recognized in common-law jurisdictions,[16] based on the historical use in them of injunctions by the chancery court where the damage-remedy in the regular courts was inadequate. Cf. James, Civil Procedure, Section 1.4 (1965). These doctrines are not necessarily applicable to Louisiana, with its different civilian procedural background, and where the injunction has historically been recognized

---

15. In the conference of this court, it was suggested that, by adequate pumps or other means (such as re-routing the waters through the Guste property), the Gustes might without removing their levee at the mouth of the Dendinger Canal, nevertheless still receive the drainage of the waters from the Poole tract. See Civil Code Article 777 and, e. g., 31 La.L.Rev. 216 (1971). Since such relief was not requested before this or the previous courts, we do not discuss it, there further being insufficient evidence as to these alternatives. Implicit in our affirmance is the right of the Gustes to secure modification of the servitude from the trial court, providing the Poole servitude of drain is fully recognized and no other rights are adversely affected. See Civil Code Article 777.

16. Because the Pooles forcibly opened the levees to drain their lands while the litigation was pending, the defendants suggest, for instance, that relief should be denied under the "clean hands" doctrine of equity in common-law jurisdictions, i. e., that one himself guilty of an evil practice should be denied injunctive relief. Although the doctrine was referred to in Rhodes v. Miller, 189 La. 288, 179 So. 430 (1938), it was nevertheless there held that the plaintiff's own wrongful conduct did not bar him from a suit for annulment of marriage. City of New Orleans v. Levy, 233 La. 844, 98 So.2d 210 (1957) is also relied upon by the defendants Guste; this simply holds that the courts will not sanction unjust and illegal discriminatory enforcement of zoning (Vieux Carre) ordinances and will, in those cases, refuse misuse of injunctions.

as a remedy available to protect possession of property, cf. La.C.Civ.P. Art. 3663(2), including (see cases previously cited) the continued use of a servitude of drain over another's land.

In further urging that injunction does not lie, the defendant Gustes likewise suggest that equity does not require the issuance of a mandatory injunction which would compel them to spend large sums of money to remedy their disturbance of the Poole drainage. Young v. International Paper Co., 179 La. 803, 155 So. 231 (1934), cited in support, held that, where negligible further harm would be caused by reason of continuing drainage of wastes into a servient estate (whereas to cease such waste would cause the industrial plant to close and thus cause grossly disproportionate hardship to the drainor), injunctive relief would be denied. See also Adams v. Town of Ruston, 194 La. 403, 193 So. 688.

The relegation of a landowner to compensatory damages instead of to injunctive relief for violation of his property right was permitted, so far as we know, in only the two cited cases concerning very exceptional situations, 27 La.L.Rev. 440 (1967), 22 La.L.Rev. 316 (1962), 3 La.L.Rev. 281–82 (1941), and never so as to deny protection of a servitude due by a servient estate to a dominant estate. See Esnard v. Can-

gelosi, 200 La. 703, 8 So.2d 673 (1942), noted 5 La.L.Rev. 141 (1941). In any event, the substantial damage here caused the dominant Poole estate by the blocking of drainage from it, and its substantial interference with the right of the Pooles to use their own property for their own purposes (the profitable growing of timber), Article 667, make inappropriate any consideration here of whether such a balancing of the equities is ever permissible to deny an owner protection of his property right by, in effect, granting his offending neighbor the right to pay damages instead of terminating such neighbor's continuing disturbance.

■ We further find unsupported by any authority the defendant Gustes' contentions (a) that recognizing the property rights of the owners of the dominant estate (thus causing them to lose at least some of the most profitable use of their own servient estate) violates due process or equal protection guarantees of the state and federal constitutions, (b) that they are entitled to cause this damage to the Poole estate in order to protect their own (the Guste) property from tidal flow,[17] and (c) that the Pooles should be denied relief because, by their improving and reconstructing a rice irrigation canal (the Peters Canal) on their own property, they could furnish

---

17. The defendants rely on Mailhot v. Pugh, 30 La.Ann. 1359 (1878). This decision concerned an extraordinary flood and an exceptional and pressing emergency in which tort recovery was denied because of the plaintiff's contributory negligence. The decision is factually and legally distinguishable.

proper drainage from their own property instead of through the Guste property as they were entitled because of the servitude of drain.

The court of appeal affirmed the trial court award to the plaintiffs Poole of $4,511.37 for timber damages sustained through the obstruction of the drainage. We find no error in this award, under the facts set forth in the opinions of the previous courts, and in their finding that suit for such damages was timely brought within a year of the time the Pooles learned of the damage, Article 3537.

For the foregoing reasons the judgments of the trial court and of the court of appeal are affirmed. The defendants are to pay all costs of these proceedings.

Affirmed.

SUMMERS, Justice (dissenting).

Many important factual aspects of this case have not been mentioned in the majority opinion. After the use of the canal for floating logs was discontinued in 1924, the canal became clogged to such an extent in places that cattle could walk across it. It served no drainage function at the time relators acquired the property in 1959. One of the Poole witnesses agreed with this. He said the only flow water in the canal at the time the levee was built consisted of tidewater and standing water caused by rain falling directly into the canal.

This fact, in my opinion, destroyed any servitude of drainage, if one was in fact ever acquired. A servitude of drain is not such unless it serves a drainage function.

What has not been emphasized in the majority opinion, and what is of such overriding significance in this case, is the fact that the greatest part of the lands involved are tidal overflow lands. A detailed investigation of the land and a review of the tidal overflow history of the area, including past hurricane surges, revealed that during the years 1961–1965, the lands involved were subject to flooding on 237, 195, 148, 218 and 259 days for each of the respective years. A protection levee with a crown elevation of 6 or 7 feet was recommended.

It was established by uncontradicted expert testimony that to open the levee system at the points ordered by the trial court and court of appeal would open the Guste property to flood water and render it useless, or by moving the levee at an expenditure of $50,000 flooding could be avoided.

At the same time, unimpeached expert testimony established that a canal on the Poole property called the Peters Canal, immediately adjacent to the float-road canal, would perform the identical function as the float-road canal since it too opened to the Bedico Canal and thence to Lake Pontchartrain, if only the Pooles would open their own unused Peters levee at one point. But the court of appeal and this Court re-

fused to recognize this fact or require the Pooles to alleviate a problem partially of their own making. Because of the refusal of the Pooles to open this levee at nominal costs, 5,000 acres of Guste property must remain unproductive or the expenditure of $50,000 is necessary. I fail to see the equity of this result. Adams v. Town of Ruston, 194 La. 403, 193 So. 688 (1940); Young v. International Paper Co., 179 La. 803, 155 So. 231 (1934).

Important, too, is the fact that no court has reached a conclusion as to the over-all dominance between the two estates. Rather their opinions seem to be concerned more with individual points along the boundary line between the Poole and Guste properties.

Article 660 of the Civil Code is concerned with servitudes which originate from the natural situation of the places and prescribes:

It is a servitude due by the estate situated below to receive the waters which run naturally from the estate situated above, provided the industry of man has not been used to create the servitude.

The proprietor below is not at liberty to raise any dam, or to make any other work, to prevent this running of the water.

The proprietor above can do nothing whereby the natural servitude due by the estate below may be rendered more burdensome.

This article of the code as interpreted by this Court in Broussard v. Cormier, 154 La. 877, 98 So. 403 (1923), and more recently in Nicholson v. Holloway Planting Co., 255 La. 1, 229 So.2d 679 (1969), convinces me that the over-all dominancy between two large estates is the controlling factor and not isolated points of drainage disproportionately small to the whole property. Where these isolated points create drainage problems the proprietor above (assuming the Poole property to be the superior estate) should be compelled to adjust the drainage within his estate and absorb the problem within the estate itself. He should not be permitted to impose upon his neighbor such a hardship as this case presents.

Visual inspection, upon which reliance was placed, is not reliable where the question of drainage concerns large, flat, tidal overflow, marshy areas. The only reliable testimony in these cases is duly qualified expert opinion based upon detailed evaluation studies and other supporting data. The only testimony in this latter category was expressed by Robert Berlin, surveyor admitted by the Pooles to be "eminently qualified," who was shown to be an expert in the use and interpretation of aerial photography.

He undertook an over-all drainage study, in the course of which he prepared one large aerial photograph whereon he superimposed the elevation data and general

direction of drainage of the two properties. In his opinion the Guste estate was the dominant estate and the direction of drainage was south and westerly. By contrast, the surveyor presented on behalf of the Poole interest was never asked which estate was dominant. His testimony concerned drainage at isolated points along the boundary.

In these circumstances the Guste property as the dominant estate owes no obligation to the Poole property except to "do nothing whereby the natural servitude due by the estate below may be rendered more burdensome." La.Civil Code art. 660. This the Gustes have not done. To the contrary they have relieved the Poole property of any water flow from the Guste property.

Even assuming that the Guste property is the servient estate, the exceptional circumstances of this situation demand a contrary result. In Mailhot v. Pugh, 30 La.Ann. 1359 (1878), the defendant conceived a plan for the defense of his plantation from floods which this Court considered intelligent and systematic. He wanted, and sought, the cooperation of the neighboring plantation owner in the construction of a common system of protection levees but the plaintiff refused, just as the facts of this case disclose that the Gustes sought the cooperation of the Pooles. Defendant then built a protection levee between the

two estates and plaintiff sued for damage to his crop caused by the water the levee threw back on his property. In this context the broader question of the servitude of drain owed to an upper estate was presented. Our predecessors, relying upon Dalbon contre Graveson of the French tribunals, quoted from that decision, saying:

> The owner of the lower ground has the right to build dikes or other works to guarantee his property against innundation, even though he aggravates thereby the damages which may be caused to the superior proprietor. (Translation supplied.)

The Court then observed that the French court in its opinion explains that the principles governing such cases are different from those regulating natural servitudes, and that works to guard against innundations of one's property from floods or torrents (hurricane surges) are regulated by other principles than those which regulate natural servitudes (La.Civil Code art. 660). Every one can preserve his property from floods even though the works will surely damage his neighbor, the court continued on French authority. Journal du Palais, 1813, p. 384; Duvernoy contre Sampso, Idem.1861, p. 888.

Quoting from Chardon, treating the obligations of the proprietor, the court recognized that all works may be executed which are judged appropriate to guard properties, against flood disasters whether

it be by dikes or other structures. And the failure of the neighbor to do likewise makes his damage due to his indolence and not to the vigilance of the proprietor who erects protective works.

Summarizing, the court noted:

So Demolombe, reiterating what had been taught by his predecessors with striking unanimity, that a proprietor has a right to protect himself from damage by an overflow by the erection of works of his own land, even though they should cause the overflow to be more hurtful to his neighbor.

Demolombe was again quoted. He observed that it was inconceivable that the law would impose upon proprietors the obligation to let their property be damaged by floods without being able to do anything about it. These principles, he wrote, which allow the proprietor to protect his lands conform with reason and equity and have always been recognized in the ancient Roman and French jurisprudence and were at that time consecrated by unanimous accord. Tome 11, No. 30.

What these authorities so wisely expound is that the law of drain servitude does not and cannot apply to flat marsh and swamp where tide is the prevailing cause of water flow. The reason for this should be obvious. Tidal waters alternately rise and fall. Consequently these waters run both ways, in and out of the lands so affected. Drainage laws on the other hand were enacted to govern the flow of water in one direction. The rule of Article 660 cannot apply to lands periodically and so frequently subject to overflow and innundation by storm and tide.

The vast reaches of lowlands, swamp and marsh which dominate the coastal regions of Louisiana can never be protected against the frequent surges of hurricanes or the ravages of floods by wind or tide and turned to agricultural or industrial uses under the narrow view the Court articulates today. It is an unrealistic application of the law detrimental to a substantial area of our State. Despite the fact that this case lends itself so well to the sound rule of law expounded by the jurisconsults and tribunals of France, no reference to that position has been made by the majority.

I respectfully dissent.