358 So.2d 986 (1978)
Herb BOXILL
v.
C. E. METRAILER et al.
No. 11908.
Court of Appeal of Louisiana, First Circuit.
March 20, 1978.
On Denial of Rehearing May 1, 1978.
Arthur Cobb, Baton Rouge, of counsel, for plaintiff-appellee Herb Boxill.
W. L. Wilson, Frank Fertitta, Henry Salassi, Jr., Baton Rouge, of counsel, for defendant-appellant C. E. Metrailer.
Michael Ponder, Baton Rouge, of counsel, for defendant-appellee Charles Hogg.
Before LANDRY, SARTAIN and ELLIS, JJ.
Per Curiam On Denial of Rehearing May 1, 1978.
*987 LANDRY, Judge.
Defendant, C. E. Metrailer (Appellant), appeals from judgment awarding plaintiff (Appellee) $12,500.00 in compensation for damages caused Appellee's property by Appellant's obstruction of natural drainage from Appellee's dominant estate onto Appellant's servient estate. The trial court rejected Appellee's claim for damages against defendant Charles Hogg (who also owns an estate servient to that of Appellee) and further rejected Appellee's claims for injunctive relief ordering defendants to remove certain obstructions. Plaintiff did not appeal rejection of his demands against Hogg, but chose, instead, merely to answer Metrailer's appeal. For procedural reasons hereinafter set forth, we affirm the judgment, rejecting plaintiff's demands against Hogg. We amend the judgment to order Appellant to take certain curative action to remove obstructions created by Appellant.

THE CASE AGAINST HOGG
Judgment was rendered on June 7, 1977, and notice thereof mailed that same day. Appellant timely filed a motion for new trial, which was denied June 28, 1977. On the same date, Appellant applied for and was granted a suspensive appeal. Bond was posted by Appellant on July 15, 1977. The return date was fixed for August 26, 1977, and extended and the record lodged in this court on November 28, 1977. On November 29, 1977, plaintiff filed an "Answer to appeal of defendant-Appellant C. E. Metrailer and appeal against defendant-Appellee Charles Hogg". Pursuant thereto plaintiff maintains that he has "appealed" against Hogg and is entitled to the relief sought against Hogg and denied by the trial court. In so contending, plaintiff relies upon La. C.C.P. Article 2133, which we find inapplicable. Article 2133 provides that an answer to an appeal is equivalent to appeal from any portion of the judgment rendered against the party answering the appeal in favor of appellant, and of which the answering party complains in his answer. In interpreting this article, the Supreme Court held in Shelton v. Aetna Casualty Company, 334 So.2d 406 (La.1976) that this article does allow an appellee relief from any portion of a judgment rendered against him in favor of appellant without appellee having to take his own appeal. The Supreme Court noted, however, that an answer to an appeal does not have the effect of an appeal with respect to any portion of the judgment rendered against appellee in favor of a party who has not appealed. Since Hogg did not appeal and Appellee did not appeal the judgment dismissing his action against Hogg, the judgment in favor of Hogg has become final and may not be reviewed on this appeal.

BACKGROUND INFORMATION
It is conceded that defendants' estates are servient to plaintiff's. The properties involved form the southern end of a 110 acre watershed which slopes and drains generally from north to south and forms a rough elongated "V". Prior to 1968, Metrailer purchased acreage situated at the bottom of the "V" and fronting on the west side of a narrow street or road known as Bluebell Drive, which has an elevation of approximately 20 feet. Adjacent to Bluebell Drive, the land is, in places, at about the level of the road and slopes off westerly into a very low and swampy area at the rear. Shortly after acquisition, Metrailer began filling and shaping the land preparatory to selling the northern portion thereof. After considerably improving his tract, Metrailer sold Hogg a parcel fronting on a circle on Bluebell Drive, and extending westerly to within about 68 feet of Metrailer's western boundary, leaving Metrailer a 68 foot wide strip behind Hogg. The Boxill property is immediately north of Hogg.
The 68 foot strip owned by Metrailer and situated behind Hogg is acknowledged to be a natural drainage swale generally sloping to the south. At the southwest corner of Hogg's land, this natural drain makes what amounts to a right angle turn to the east and thence runs adjacent to Hogg's southern boundary a distance of about 300 feet to Bluebell Drive. This portion of the swale, entirely on Metrailer's land, is 60 feet *988 wide. At Bluebell Drive, an outlet culvert is situated in the swale to carry water under the road.
Plaintiff's property, lying north of Hogg's, has comparatively little frontage on Bluebell Drive. The tract is vaguely panhandled in shape, the handle comprising the southeast corner of the land and constituting its entire frontage on Bluebell Drive. At the northwest corner of the handle, the tract widens to 5 or 6 times its road frontage and forms a rough rectangle, extending in a northerly-southerly direction.
Northeast of plaintiff's northeast corner there is an artificial lake known as Meadowlea Lake and directly north of plaintiff's northern boundary is another artificial lake known as Sylvest Lake. Both lakes are on lands of persons not parties herein. The lakes were created in part by their owners dredging low spots and erecting dams between the lower ends of their lakes and plaintiff's lands. The Meadowlea Lake dam virtually abuts plaintiff's property. The Sylvest Lake dam is a short distance north of plaintiff's northern boundary. Both lakes result in some seepage onto plaintiff's property due to ground saturation, even during dry periods.
When Appellant purchased the land, it was considered "wild". Although comparatively high in spots near Bluebell, it tapered off into a low swampy area at its western extremity where it was swampy, overgrown with brush and trees, and had low spots which held water.
When plaintiff made his purchase, a considerable portion of plaintiff's water drained across Hogg's tract near Bluebell. The remainder drained to the west, following the natural slope of the land, into the swale behind Hogg and thence into the swale along Metrailer's northern boundary from where it drained through the outlet beneath Bluebell. The culvert is made of corrugated metal, oval in shape and measures 27 × 43 inches. It is 33 feet long and its inverse or inlet end, west of Bluebell, is set at an elevation of 15.78 feet. This culvert was apparently installed by a former owner who is not a party herein. It is the only means of outlet from the natural swale drain which is otherwise blocked by Bluebell. The outlet end of this culvert discharges into a lake east of Bluebell. The lake empties into a canal or ditch which flows easterly or southeasterly into Bayou Duplantier about 1/4 mile east of Bluebell. Bayou Duplantier, which flows south has a normal elevation of 9 feet. Before Metrailer made improvements, water flowed out of the drainage swale during rainy weather through the culvert under Bluebell. When the flow exceeded the 70 cubic feet per second capacity of the culvert, which is about 1/3 of the 210 cubic feet per second runoff produced by the entire watershed, water rose in the swale until it reached the elevation of Bluebell road and overflowed. This happened and still happens with some frequency. At times Bayou Duplantier, which is in need of clearing and enlarging, overflows and backs up so that water runs from the Bayou northerly and westerly across Bluebell onto litigants' properties instead of the process being reversed. This reverse flow continues until the Bayou recedes and resumes its normal flow. This also is a fairly common phenomenon. A tree partly obstructs the outlet end of the culvert beneath Bluebell and the outlet ditch or canal east of Bluebell is partly obstructed by growth, both of which conditions are beyond Appellant's control.
Shortly after his acquisition in 1968, Appellant commenced clearing his land. He removed trees and debris from the natural channel. He added approximately 1100 loads of dirt, some in the channel area, in preparing the land for building his home and making a portion thereof attractive to a potential buyer. To the drain under Bluebell, Appellant added an additional 100 feet of corrugated pipe measuring 31 by 50 inches. At the westerly end of this addition, he constructed a catch basin to which he attached an additional 200 feet of 36 inch reinforced concrete pipe. This 300 foot addition runs westerly from Bluebell to about the southwest corner of Hogg's land. Appellant laid the added pipe in a 2½ foot trench and covered the pipe with dirt to a *989 depth of about four feet. The elevation of the fill over the pipe equals or exceeds the elevation of Bluebell in some spots. The invert of the added pipe is 3 inches above the level of the invert of the drain beneath Bluebell. The addition of this pipe and fill has raised channel levels thus reducing its capacity as a ponding or storage area when the pipe beneath Bluebell is at capacity flow. In addition, the ponding which formerly took place within the 60 foot servitude area along Metrailer's northern boundary has been shifted and moved northward to the southwest corner of plaintiff's land.
Plaintiff purchased his land in 1968, and began preparation for a homesite near Bluebell. He brought in about 40 loads of dirt and graded the area where his house was built. He elevated the living quarters portion of the house approximately 6 feet above the ground. To take care of the seepage from Meadowlea and Sylvest Lakes, which exists even during dry spells, plaintiff dug small ditches leading from each dam to channel the water into the swale behind the Hogg tract. The front portion of plaintiff's tract, which originally drained across the Hogg tract, became blocked when Hogg built his home and constructed a driveway along the northern boundary of Hogg's land. Hogg elevated the driveway to the extent that it forms a dam blocking the natural southerly flow and causes reverse drainage from Hogg's land onto plaintiff's. This reverse flow has caused erosion along plaintiff's southern boundary adjacent to Hogg's driveway. Plaintiff did some corrective work at the rear of his land, including the southwest corner which adjoins the swale behind the Hogg land. In this area, plaintiff removed some trees and brush and did some contouring of the land, maintaining, however, the southerly flow. Some low spots remain in this area of plaintiff's land where water collects during rains.
In 1969, plaintiff complained to local authorities that work being done by Appellant was altering natural drainage facilities. On October 24, 1969, Appellant received a letter from the Department of Public Works, cautioning Appellant not to place any fill on his land which might alter natural drainage without prior approval from the Department. Appellant was also advised to submit for approval any work proposed to be done. On May 29, 1973, plaintiff again complained to the authorities. Appellant was again warned in writing by Charles Hair, employee of the Department of Public Works, not to alter drainage facilities without approval. On January 21, 1975, Appellant was advised by the Department of Public Works that a requested occupancy permit would not be issued until Appellant obtained approval of the drainage work done. On March 24, 1975, the Department advised Appellant that the added drain pipes would raise water levels about 0.43 feet at the upper end when the pipe was flowing full. Appellant was also advised that the situation could be corrected by Appellant dedicating a servitude across the natural drain west of Hogg and along Appellant's north property line and the grading out of a large swale over the existing pipe as it was before Appellant's alteration of the channel. It was also recommended that Appellant grade the entire area to a swale with a bottom elevation of 19 feet at the pipe entrance and having 11H:IV side slopes and further that the entire area be maintained open with no buildings or fill therein. Appellant has since made an informal servitude dedication of the natural drainage area as shown on a survey made for Appellant by Clary & Associates, Consulting Engineers, dated February 12, 1977. This map does not appear to have been placed in the public record.

THE ISSUES
Plaintiff contends that Metrailer's addition of the pipe and fill in the natural drain area causes ponding to take place at the southwest corner of plaintiff's land instead of on Appellant's lower lands as was the case previously. Plaintiff also contends that this obstruction causes water to stand on his land for longer periods than before, causing the land to remain wet and damp so that grass no longer grows in the area, thus creating an unusable boggy area which *990 plaintiff could maintain as a lawn prior to the obstructions created by Appellant.
Appellant acknowledges his obligation to accept all water from above but contends: (1) Improvements in the upper watershed consisting of construction of homes, driveways, swimming pools and other structures covering ground surface have drastically reduced ground absorption capacity, creating a significant increase in flow which must eventually pass through the natural channel on his property, and that he is entitled to relief therefrom; (2) Plaintiff has made changes on his own property which have increased the rate and direction of flow onto Appellant's land; and (3) Part of plaintiff's runoff problem is due to collection of debris in low spots at the rear of plaintiff's land and along fence lines erected by plaintiff and the erection of dams by plaintiff to protect his lands from overflow and seepage from the Meadowlea Lake and Sylvest dams above.

THE EVIDENCE
Mr. Leo Jackson Muse, former employee of the Department of Public Works, testified as to his familiarity with the area in question. He was aware that the road elevation of Bluebell is 20 feet and that the southwest corner of plaintiff's property is approximately 18 feet where it joins the natural swale behind Hogg's land. He wrote the letter sent to Appellant on October 24, 1969. Prior to writing the letter, he investigated plaintiff's complaint and advised Appellant that Appellant could not fill the drain above road level. He authorized (apparently verbally) Appellant to install a 36 inch drain where water formerly collected near the road. He acknowledged that the culvert under the road was insufficient to handle the entire runoff but he allowed Appellant to fill the drain so long as the fill did not exceed road level. In this way, according to Muse, water would flow over the added pipe and across the road as before when the outlet pipe reached capacity. He acknowledged that the added pipe had the effect of extending the ponding area northerly and westerly to the end of the addition. He felt, however, that the effect of the ponding on plaintiff's property was minimal because the water level on plaintiff's land was raised only about ½ foot and such excess drains off in about a three hour period even during excessive rainfall periods.
Dr. Frank Germano, Civil Engineer, testifying for Appellant, maintains that the work done by Appellant facilitates drainage from plaintiff's land and dries plaintiff's low swampy area better than before. He also contends that much of plaintiff's problem is from seepage (ground saturation) resulting from construction of Meadowlea Lake and Sylvest Lake. Further, he stated that his inspection showed that collection of water on plaintiff's land is due mainly to holes, brush, trees and debris which either collect water in low places or impede runoff from plaintiff's land. He also acknowledged that the invert of the pipe under the road is at 15.78 feet; the invert of Appellant's addition is 14.8 and the invert of Appellant's catch basin (where the concrete pipe addition joins the corrugated pipe addition) is 15.26 feet.
Mr. and Mrs. Boxill testified in essence that before Appellant commenced filling his land there was no problem with drainage. Water flowed normally from plaintiff's land across what is now the Hogg property, and also flowed to the rear and west into the natural channel behind Hogg. Since the addition of pipe, water ponds in the southwest corner of plaintiff's tract and remains for 24 hours or more following heavy rains. The area of ponding on plaintiff's property which was usable before and could be mowed and maintained is now a bog or swamp which remains wet and soggy such that grass will not grow thereon, and the area has become an eyesore.
Mr. and Mrs. Boxill further stated that Hogg elevated his driveway situated adjacent to plaintiff's southern boundary, creating a dam which effectively blocked the southerly flow from plaintiff's land in this area. Plaintiff concedes that all water drains from his lands as before but that the rate of runoff has been impeded significantly *991 resulting in problems not previously experienced.
Charles W. Hair, Civil Engineer, employee of the Department of Public Works, acknowledged receiving a complaint from plaintiff in 1969. Thereafter his staff had numerous conferences with Appellant. He informed Appellant to do no work without approval. In 1973, following another complaint from plaintiff, he again directed Appellant to do no work without approval. In Hair's opinion, the principal problem created by Appellant's improvement is elimination of the former swale in the natural drainage channel. He so found because the pipe installed by Appellant carried very little flow during heavy rains when the bulk of the flow was imponded west of Bluebell Drive until water level reached road level and overflowed the road. He believes that the pipe under Bluebell is sufficient to drain only "dry weather water", meaning in general the water produced by seepage from lakes above plaintiff's property and during light or ordinary rains. He instructed Appellant to add no pipe to the outlet culvert because said facility served little purpose, and not to put any fill whatsoever in the natural drain. He stated that the pipe and fill in the drain area in effect served only to occupy what was formerly storage area in the natural drain and caused the ponding to commence at the inlet of the pipe. He suggested that defendant dedicate a servitude of drain over and across the 68 foot wide natural drain behind Hogg's land and the continuation thereof in the form of a natural 60 foot drain along the northern boundary of Appellant's land from its western boundary easterly to Bluebell Drive. He also recommended that Appellant leave the pipe in place but remove all fill and restore the swale which formerly existed. Hair believed that such curative measures would effectively restore all parties to their former situations.
William Addison, Civil Engineer in the employ of the Department, testified that Appellant filled an estimated area four feet deep, 200 feet long west of Bluebell Drive. He agreed with Hair that the fill moved the ponding area from Appellant's land back to plaintiff's property. He maintained, however, that this result was of little effect because it raised the water level on plaintiff's land about 5½ inches only and that the extra water collected on plaintiff's land ran off within about 3 hours and was of little consequence.
J. S. Durrett, Civil Engineer, employed by the Department, corroborated Hair in general. He noted that while plaintiff's land still drains onto Appellant's, the work erected by Appellant has produced a significant increase in runoff time. His appraisal of existing conditions led to the conclusion that proper drainage was possible only by the installation of two 48 inch lines of concrete pipe laid beside the existing line running under Bluebell west a distance of 300 feet and ending at the end of the existing pipe, a total length of 330 feet. In addition, the servitude area behind Hogg's property requires grading to a gentle swale leading to the inverse ends of the three drains.
Fred L. Goodman, Civil Engineer, contract estimator for a large contracting firm, reviewed Durrett's plans for the above suggested curative work and estimated the cost thereof to be $39,000.00. He also estimated the cost of curing the reverse drainage from Hogg, by constructing a 60 foot retaining wall north of Hogg's driveway, to be $7,500.00.

FACTUAL FINDINGS
The trial judge found that the works erected by Hogg and Appellant did impede the flow of water from plaintiff's dominant estate. He also concluded that damage to plaintiff, though minimal, would be continuous, but that the cost of cure would be out of proportion to the resulting damage. For that reason, he declined to order the injunctive relief requested by plaintiff.
Although the evidence is conflicting, we fully concur in the trial court's finding that the works erected by Appellant in the natural drain area has impeded flow in this natural channel and causes water to pond on plaintiff's property to a significantly *992 greater degree and duration than before. We also share the trial court's finding that this added degree and duration of ponding has caused formerly usable portions of plaintiff's land to become unusuable and unsightly because ground formerly dry now remains so wet that grass will not grow.

THE APPLICABLE LAW
The respective rights and obligations of the parties herein are governed by La.C.C. Articles 659 and 660, which provide:
Art. 659. Servitudes arise either from the natural situation of the places, from the obligations imposed by law, or from contract between the respective owners.
Art. 660. It is a servitude due by the estate situated below to receive the waters which run naturally from the estate situated above, provided the industry of man has not been used to create that servitude.
The proprietor below is not at liberty to raise any dam, or to make any other work, to prevent this running of the water.
The proprietor above can do nothing whereby the natural servitude due by the estate below may be rendered more burdensome.
In denying plaintiff injunctive relief, the trial court relied upon Adams v. Town of Ruston, 194 La. 403, 193 So. 688 (1940) and Young v. International Paper Co., 179 La. 803, 155 So. 231 (1934). In Young, the court declined to issue an injunction which would have closed a large paper mill upon finding that plaintiff could be compensated in damages for harm already done by waste discharges and that future damages would be negligible. The court concluded that in such cases, injunctive relief is discretionary with the trial court; that balancing of equities was in order; and, that denial of injunctive relief is proper when damages may be compensated monetarily and that the granting of such relief would subject defendant to a grossly disproportionate hardship. Adams reached substantially the same result for the same reasons when the court declined to enjoin flow from a municipal swimming pool upon finding that the damage to the dominant estate was relatively minor.
More recently, in Poole v. Guste, 261 La. 1110, 262 So.2d 339 (1972), the Supreme Court reassessed and apparently limited application of the rule applied in Young and Adams. In Poole, the court noted that denial of injunctive relief had been ordered in only the two cited cases which involved "very exceptional situations". Such exceptional circumstances were found lacking in Poole and the owner of the servient estate was enjoined to remove drainage obstructions. In so decreeing, the court noted:
"The relegation of a landowner to compensatory damages instead of to injunctive relief for violation of his property right was permitted, so far as we know, in only the two cited cases concerning very exceptional situations, 27 La.L.Rev. 440 (1967), 22 La.L.Rev. 316 (1962), 3 La. L.Rev. 281-82 (1941), and never so as to deny protection of a servitude due by a servient estate to a dominant estate. See Esnard v. Cangelosi, 200 La. 703, 8 So.2d 673 (1942), noted 5 La.L.Rev. 141 (1941). In any event, the substantial damage here caused the dominant Poole estate by the blocking of drainage from it, and its substantial interference with the right of the Pooles to use their own property for their own purposes (the profitable growing of timber), Article 667, make inappropriate any consideration here of whether such a balancing of the equities is ever permissible to deny an owner protection of his property right by, in effect, granting his offending neighbor the right to pay damages instead of terminating such neighbor's continuing disturbance."
We think Poole, above, makes it clear that unless there is some substantial interest to be served, the rule in Young and Adams, above, will henceforth be given limited application and owners of dominant estates will be awarded injunctive relief even though the cost of cure may be substantial, unless a very exceptional situation is presented. We find no such exceptional situation in this instance.
*993 We do not reach Appellant's claim for relief on the ground that his obligation has been made more burdensome by works constructed by owners above. Except for plaintiff, the owners of the upper estates are not parties herein and their rights and/or obligations may not be adjudicated in absentia. As regards plaintiff, the record fails to establish that improvements on plaintiff's land have increased the flow of water onto Appellant's land in such degree as to entitle Appellant to relief.
We conclude that the curative work recommended by Mr. Hair appears most plausible and will restore the situation substantially to the condition which existed before Appellant placed the pipes and fill in the drainage channel. Accordingly, we will order this plan implemented. Alternatively, Appellant will be ordered to effectuate the plan suggested by Durrett.
It is ordered, adjudged and decreed that the judgment rendered by the trial court awarding plaintiff damages against Appellant Metrailer in the sum of $12,500.00 be affirmed.
It is further ordered, adjudged and decreed that there be judgment herein in favor of plaintiff and against defendant Metrailer ordering, directing and commanding said defendant, within 60 days of date of finality of this judgment, to formally dedicate a servitude of drain over and across the 68 foot strip owned by defendant and situated to the rear of Hogg's property and the continuation thereof in the form of a strip 60 feet wide parallel to Metrailer's northern boundary from Metrailer's western boundary easterly to Bluebell Drive; remove all dirt fill above the pipe installed in this drainage area; contour the servitude area into a gentle swale from the upper end behind Hogg's tract to the inlet of the existing pipe; and, contour the servitude area into a gentle swale from the end of the existing pipe to Bluebell Drive. Alternatively, Appellant may elect to install two lines of 36 inch reinforced concrete pipe beside the existing pipe, commencing at the end of the present pipe and extending beneath Bluebell Drive. All costs of these proceedings to be paid by Appellant Metrailer.
Amended and rendered.

ON APPLICATION FOR REHEARING BY PLAINTIFF HERB BOXILL
PER CURIAM.
In application for rehearing, plaintiff, Herb Boxill, assigns error, inter alia, in our decree concerning the size of the two lines of reinforced concrete which we required to be laid by defendant, Metrailer. Applicant correctly notes that whereas we specified 36" pipe, we should have designated 48" pipe as recommended by J. S. Durrett, Civil Engineer.
Accordingly, our original decree is amended to require installation of 48" reinforced concrete pipe by defendant Metrailer instead of 36" pipe. We find no merit in the remaining issues raised by Applicant.
The application for rehearing is refused.