452 So.2d 204 (1984)
J.B. HORNE, Jr.
v.
LIBERTY FURNITURE COMPANY, Travelers Insurance Company, et al.
No. 83-CA-738.
Court of Appeal of Louisiana, Fifth Circuit.
May 18, 1984.
Writ Denied September 14, 1984.
*206 Robert J. David, Nick F. Noriea, Jr., Kierr, Gainsburgh, Benjamin, Fallon & Lewis, New Orleans, for plaintiff-appellee.
John C. Combe, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendants-appellees.
Wood Brown, III, Montgomery, Barnett, Brown & Read, New Orleans, for defendants-appellants.
Joseph F. Clark, Jr., Hammett, Leake & Hammett, New Orleans, for intervenor-appellee.
Before BOUTALL, KLIEBERT and GAUDIN, JJ.
KLIEBERT, Judge.
The plaintiff, J.B. Horne, Jr., an employee of Levitz Furniture Store, brought this suit in tort to recover damages for personal injuries sustained when, on February 3, 1976, a chair he was occupying in the employees' lounge collapsed. The defendants in the suit were Liberty Furniture Corporation, the manufacturer of the chair; Employers Mutual Liability Insurance Company of Wisconsin, the manufacturer's product liability insurer; John Wilkins, general manager, and Charles Roberts, operations manager, of Levitz, and Travelers Insurance Company, the compensation and liability insurer of Levitz and its executive officers. Liberty's liability was alleged to be the manufacture of a defective chair. The alleged fault against the executive officers was the failure to inspect, maintain and repair the furniture in the employees' lounge, thus failing to provide the employees a safe place to work.[1]
At the conclusion of the trial, the district judge, sitting without a jury, granted a motion for a directed verdict dismissing the defendant, John Wilkins, from the suit. *207 Subsequently, by judgment dated June 8, 1983, he cast Liberty in judgment for $150,000.00 and recognized a preference compensation claim for Travelers of $32,879.85 ($28,210.00 of compensation payments and $4,669.85 for medicals) against the plaintiff's award. The judgment also dismissed the plaintiff's suit against Roberts and Travelers.
Liberty suspensively appealed from the judgment. The plaintiff answered Liberty's appeal. There was no appeal of the judgment granting a motion for a directed verdict dismissing the suit against John Wilkins.
Travelers filed a motion for an amended judgment which was set for hearing in September, 1983, but the record does not show what happened to this motion. In its brief, Travelers says the motion was never heard in the trial court.
After the record was lodged in this court, Roberts and Travelers filed a motion to dismiss the appeal. The motion was grounded in the contention they could not be made parties to the appeal by the plaintiff's answering Liberty's appeal.
For the reasons hereafter stated, we affirm the trial court's judgment.

MOTION TO DISMISS
Pursuant to the provisions of LSA-C. C.P. Article 2121, Liberty perfected an appeal of the judgment against it. Neither Roberts, Travelers, nor the plaintiff perfected an appeal of their own. Instead, after the record was lodged with this court, the plaintiff filed a pleading entitled "Appeal and Answer to Suspensive and Devolutive Appeal" with an attached order granting a devolutive appeal and an answer to the appeal. Since this was not the proper court in which to apply for the appeal, the Chief Judge struck that portion of the order granting an appeal and signed the order, thus leaving an order which read in pertinent part as follows: "Let plaintiff, J.B. Horne, Jr., be and he is hereby granted an answer to the appeal filed by Liberty...." Thus, there is no plaintiff's appeal to dismiss. Further, the answer filed by plaintiff limits the portions of the judgment he can complain of on appeal.
LSA-C.C.P. Article 2133 provides as follows:
Art. 2133. Answer of appellee; when necessary
An appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant. In such cases, he must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record whichever is later. The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him in favor of the appellant and of which he complains in his answer. Additionally, however, an appellee may by answer to the appeal, demand modification, revision, or reversal of the judgment insofar as it did not allow or consider relief prayed for by an incidental action filed in the trial court. If an appellee files such an answer, all other parties to the incidental demand may file similar answers within fifteen days of the appellee's action.
Amended by Acts 1968, No. 129, § 1; Acts 1970, No. 474, § 1.
As we understand the article, plaintiff's answer can only afford him appellate relief with respect to the judgment rendered against Liberty and then only as to the portion he complains of. It cannot afford him relief against Roberts or his insurer because they were not appellants. See Ogaard v. Wiley, 325 So.2d 642 (La. App. 3rd Cir.1975); Alleman v. Sentry Insurance Company, 257 So.2d 799 (La.App. 3rd Cir.1972); Lumber Products, Inc. v. Hiriart, 255 So.2d 783 (La.App. 4th Cir. 1971); Boxill v. Metrailer, 358 So.2d 986 (La.App. 1st Cir.1978). Hence, although plaintiff argues for it, we cannot give him any relief from the trial court's dismissal of his claim against Roberts and Travelers.

*208 LIABILITY
The law of products liability in Louisiana is well settled and can be succintly outlined. A manufacturer of a product may be held liable for injuries caused by its product without a showing of knowledge or negligence if the plaintiff establishes (1) there was a defect in the design or manufacture of the product, (2) the product was in normal use, (3) the defect created an unreasonable risk, and (4) the plaintiff's injury was caused by the defective product. Weber v. Fidelity & Casualty Insurance Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971); Hunt v. City Stores, Inc., 387 So.2d 585 (La.1980). Once the plaintiff has established the elements of a products liability claim, only a showing by the defendant of the assumption of the risk by the plaintiff will bar a recovery. Harris v. Atlanta Stove Works, Inc., 428 So.2d 1040 (La.App. 1st Cir.1983); Bell v. Jet Wheel Blast, Division of Ervin Industries, 709 F.2d 6 (5th Cir.1982).
Liberty's assignments of error on this appeal can be condensed into three contentions(1) the chair which collapsed was not manufactured by Liberty or it was not the same one shown in the pictures used by the experts in formulating their conclusions, (2) the chair was abused and its collapse was caused by the abuse or defective wood and not by a defect in its manufacture, and (3) the plaintiff assumed the risk and/or was contributorily negligent.
We will now consider Liberty's first enumerated assignment of error.
Mr. Christenberry, Liberty's representative, testified that he inspected the broken chair some time after the accident, found Liberty's inventory number on the chairs in the employees' lounge and satisfied himself the chairs were manufactured by Liberty and the pictures of the broken chair submitted in evidence were of the same chair shown to him as the chair which collapsed while occupied by the plaintiff. Mrs. Phyllis Weber, who took the photos and identified same as plaintiff's exhibits 12A through 12L, testified that she was shown the chair involved in the accident in the Levitz conference room and photographed it. Further, she testified the chair in the picture was the chair involved in the accident.
Thus, the record contains ample evidence to support the trial judge's conclusion the chair which collapsed was manufactured by Liberty and the pictures used by the experts were of the chair which collapsed. Although there is evidence which might indicate otherwise, we cannot say the trial judge committed manifest error in finding Liberty was the manufacturer of the chair which collapsed and the pictures used by the experts was of this chair. Without manifest error, we cannot change the trial court's finding of fact. Canter v. Koehring, 283 So.2d 716 (La. 1973).
Next we consider what caused the chair to collapse.
Plaintiff's experts, testifying from photographs, said the chair collapsed because of improper gluing. Their conclusion was based on the fact the wood dowels pulled out of the sockets rather than sheared. An examination of the pictures supports their conclusion.
Thus, the record supports the trial judge's conclusion the chair was defective. Although there were conflicting accounts of exactly how the chair collapsed, the pictures establish with certainty that the dowels pulled out rather than sheared. The experts all testified that once properly glued, the dowels would be stronger than wood and, therefore, would shear before pulling out of the sockets. Hence, the trial judge's conclusion that the chair was defective should not be disturbed. Pawlak v. Brown, 430 So.2d 1346 (La.App. 3rd Cir. 1983).
Liberty also argues the placing of the chair in a commercial lunchroom constituted a misuse or abuse of the product because the chairs were designed for home use. Plaintiff counters with the contention Liberty should have anticipated the chairs might be used in a non-residential situation but failed to give a limited use warning; *209 consequently, plaintiff argues the use of the chair in a foreseeable and intended manner is not sufficient to establish misuse and cites Storey v. Lambert's Limbs & Braces, Inc., 426 So.2d 676 (La.App. 1st Cir.1982) to support it. Liberty argues, however, that Levitz, being a long time furniture dealer, had knowledge of the characteristics of the furniture and, hence, was a sophisticated purchaser. As such, Liberty had no duty to warn Levitz of the danger of placing the chair in use in the employees' lounge. In support of the contention, counsel for Liberty cites Foster v. Marshall, 341 So.2d 1354 (La.App. 2nd Cir. 1977); American Ins. Co. v. Duo Fast Dixie, Inc., 367 So.2d 415 (La.App. 4th Cir. 1979), which hold that a manufacturer or retailer is not required to warn the user of a danger where the user is or should be aware of the danger.
We note that the determination of what is an open and obvious danger is a factual one. Our courts have held that (1) leaning too far on a ladder is an obvious danger, Bell v. Marriott Hotels, Inc., 411 So.2d 687 (La.App. 4th Cir.1982); (2) a gasoline producer has no duty to warn a retailer that gasoline is dangerous, Butler v. Atwood, 420 So.2d 742 (La.App. 4th Cir. 1982); or that (3) operating electrical equipment in water is dangerous, Lovell v. Earl Grissmer Co., Inc., 422 So.2d 1344 (La. App. 1st Cir.1982). Here the defect was actually hidden (the improper or inadequate gluing could not be detected until the chair collapsed) and there is nothing to indicate the use of the chair in the lounge area was an obvious or apparent danger. Accordingly, we cannot say the trial court erred in concluding Liberty was required to give warning the chair was not intended for commercial use to absolve itself of liability.
To carry its burden of proof, a plaintiff in a products strict liability suit, such as the one present here, need only prove that the product was defective, i.e., unreasonably dangerous to normal use and that his injuries were caused by reason of the defect. Weber v. Fidelity & Casualty Insurance Co. of N.Y., supra. It is not necessary to prove the exact or precise nature of the defect, but rather, only that a manufacturing defect existed and that it caused the accident. Hunt v. Ford Motor Co., 341 So.2d 614 (La.App. 2nd Cir.1977). This rule applies because a manufacturer warrants that his product is reasonably fit for the use for which it is intended when it is sold and is presumed to know the vice or defect of the product he manufactures. Spillers v. Montgomery Ward & Co., Inc., 294 So.2d 803 (La.1974); Penn v. Inferno Mfg. Corp., 199 So.2d 210 (La.App. 1st Cir. 1967), writ denied, 251 La. 27, 202 So.2d 649 (1967); Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978).
Further, the manufacturer owes an affirmative duty to any user of its product to assure him that all hazards or defects are eliminated from the product. Also, the manufacturer has an independent duty to test and inspect its product. Samaha v. Southern Rambler Sales, Inc., 146 So.2d 29 (La.App. 4th Cir.1962). Here, the defendant's employee-expert admitted there was absolutely no testing and only a visual inspection of the product.
In our view, the trial judge correctly concluded the plaintiff met the burden of proof necessary to impose liability on the manufacturer. In substance, he proved the chair was (1) defective, (2) it was in normal use, and (3) the defect created an unusual risk and (4) the defect was the cause of some of the plaintiff's complaints.
Next we consider Liberty's contention as to contributory negligence and assumption of risk.
There is no evidence the plaintiff used the chair other than in the normal and proper way; nor is there evidence from which we could conclude the plaintiff contributed to the chair's collapse. Accordingly, we need not consider the legal issue as to whether the doctrine of contributory negligence can be applied in this type of products strict liability case.
Further, the mere fact the plaintiff weighed 300 lbs. does not place *210 him in a class of extra ordinary persons who must exercise special care and caution in selecting a chair to sit in. Additionally, the plaintiff was not under an obligation to use extra care because the chairs in the lounge were known to be defective or wobbly. The recorded statements relied on by the defendant to show the chair was in disrepair were given by the plaintiff while in the hospital and were explained by him as being based upon hearsay information given to him by one of Levitz's managers. There is nothing in the record indicating the chairs were wobbly or in apparent disrepair prior to the time the chair collapsed.
Although Liberty urges the application of the doctrines of contributory negligence and/or assumption of risk, the arguments are simply without basis in the evidence.

QUANTUM
After hearing the evidence, the trial judge made the following findings as to the plaintiff's injuries:
"6. Plaintiff has grossly exaggerated his injuries and the alleged resulting disability;
7. Plaintiff has grossly exaggerated his need for `nursing care' and his inability to perform the most intimate personal acts necessary for daily body hygiene. This court finds that he falsely testified about the latter functions on the court's observation of the plaintiff's movements in his wheelchair and the ease in which he maneuvered this vehicle. This court would apply the maxim `falsus in uno, falsus in omnibus', and no part of his statements is entitled to credence.
8. Plaintiff professed he could not bend at the waist however, a private investigator observed him at his residence moving about without walker or wheelchair and bending at the waist.
9. Plaintiff prescribed and obtained his wheelchair prior to any medical advice or prescription therefor;
10. Plaintiff is not a paraplegic as he portrayed himself by his actions in court by being constantly in a wheelchair and being pushed to and from the courtroom and rushed in great haste to the restroom by his live-in female companion and `nurse'.
11. Plaintiff had no broken bones as a result of the accident and received no more than at most some undefined nonspecific soft tissue injury."
After carefully reviewing the record, we cannot say the trial judge was clearly wrong in his findings as to the injury or the plaintiff's exaggeration or his award of damages.
The evidence shows the plaintiff had substantial injuries which predated the accident.
While performing a spinal fusion, Dr. Gernon Brown noted a previous laminectomy (it had been performed in 1963) and noted that plaintiff was suffering from a progressively worsening degenerative spine disease.
Additionally, plaintiff had sought treatment for a back injury in Portmouth, Virginia, after a slip and fall accident on December 26, 1975 which was five weeks prior to the date the chair collapsed. The medical report of the treating physician in Virginia concluded that although Mr. Horne complained of spinal pain when he moved his head, x-rays showed no objective evidence of injury, however, they did note evidence of "scattered degenerative lipping". This report also showed plaintiff was then suffering from hypertension.
On his return to New Orleans from Virginia, plaintiff went to Dr. Marrero, an orthopedic surgeon for treatment. According to Dr. Marrero, plaintiff's complaints of pain after the fall in Virginia were relative to the cervical spine and upper lumbar while complaints made to Dr. Marrero after the collapse of the chair were relative to the lower lumbar area of the back.
Dr. Marrero testified he diagnosed the injury after the collapse of the chair as a sprain of the lower lumbar which he originally believed would clear up in time. He testified there was a tremendous psychological overlay with great complaints of pain and no organic basis for same. The *211 plaintiff's complaints were out of character with the physical findings.
Dr. Gernon Brown, Jr., the primary treating orthopedic surgeon, first saw the plaintiff on June 2, 1976 (prior thereto he was under the treatment of Dr. Marrero) and hospitalized him for evaluation. Xrays taken during the hospitalization showed a narrowing of the disc spaces, which Dr. Brown said was a characteristic of a degenerative disc disease. He concluded the plaintiff had an injury to his back "superimposed on a pre-existing disc disease". He operated on the plaintiff to try and relieve his complaints of pain by doing a double fusion at L.4 and L.5. Only a fusion was performed. No discs were removed.
At the time of his last examination in 1981, Dr. Brown believed the plaintiff was totally disabled with no hope of rehabilitation unless the plaintiff first lost substantial weight. He would not say, however, that the collapsed chair was the cause of all of the plaintiff's present problems. Rather, he believed a combination of factors, including obesity and degenerative disc disease, was the cause of his present disability. Further, he believed plaintiff's refusal to reduce his weight retarded his recovery from the injuries sustained in the chair accident.
Dr. Brown referred the plaintiff to Dr. Stuart Phillips, another orthopedic surgeon in May 1980, which was after the surgery had been performed by Dr. Brown. He examined the plaintiff and reviewed all of his records. At the time of the examination he found marked paravertebral muscle spasm in the lower lumbar region. He concluded the plaintiff had "spinal stenosis" which means a narrowing of the spinal canal and believed this had been aggravated by the chair collapse. According to this orthopedist, the surgery on the plaintiff's back had resulted in scar tissue which could be pressing against a nerve and the cause of the plaintiff's complaint of pain. Additionally, surgery in his view would further aggravate rather than relieve the problem.
At the time of trial, plaintiff had been treated for maladies associated with obesity. Dr. Mayer Heiman testified that he first saw the plaintiff in 1976 and began to treat him for "obesity, hypertension and probable heart disease". He believed stress aggravates or may even precipitate high blood pressure. He had confined the plaintiff to the hospital in 1979 and 1980 for the high blood pressure. He did not attribute these problems of the plaintiff to the collapsed chair.
The private investigator's observation of the plaintiff as to his ability to bend at the waist and to move about his residence without the use of a walker or wheelchair was unrefuted. The self-prescribed remedies found by the trial judge were also unrefuted.
The record clearly reveals the plaintiff had an extensive history of back related problems and symptoms of degenerative spinal disease which predated the chair collapse. The back surgery performed prior to the fall, degenerative disc disease, obesity, hypertension and heart disease were not caused by the fall and there existed sincere doubt by the doctors as to whether the pre-existing problems were aggravated by the chair accident. As stated by the trial judge, although the medical testimony is replete with findings of physical ailments disconnected with and unrelated to any reasonably certain accident related injury, there is nothing in the record to indicate the plaintiff will incur future medical expenses for accident related injuries or that the plaintiff could not be gainfully employed. We cannot say this conclusion drawn from the evidence was wrong.
In his original brief, counsel for the defendant said: "The quantum award is somewhat excessive in view of the evidence of the prior accident and self-prescription of treatment indulged in by the plaintiff. However, the amount awarded is clearly within the much discretion of the trial court...." We agree with this observation and hence cannot say the trial judge was clearly wrong in refusing to award future medical expenses or awarding $150,000.00 *212 for loss of past and future earnings and general damages; nor are we at liberty to substitute our opinion as to the amount of the award for that of the trial court. Spillers v. Montgomery Ward & Co., Inc., supra.

RECOVERY FOR COMPENSATION BENEFITS
Travelers, the compensation carrier, filed an intervention in the trial court and was awarded a preferential claim against the plaintiff's award of $32,879.38, made up of $28,210.00 for weekly compensation benefits paid to June 18, 1982 and medical expenses of $4,669.38. In the brief filed on appeal, Travelers urges an increase in its claim of $40,000.00 for medical expenses and an award or a declaration of entitlement for future medical expenses it may be required to pay to the plaintiff.
The plaintiff on the other hand argues that the trial court award to the plaintiff did not include an award for past due or future medical expenses, hence, the award to the intervenor should be reduced by $4,669.38.
Whatever may be the merit of either contention, we note the following: Travelers did not appeal, nor did it file an answer to the appeal. Hence, we are powerless to grant it the relief requested. Likewise, as shown under the caption "Motion to Dismiss", the plaintiff failed to timely appeal. Rather, it answered the appeal taken by Liberty of the judgment rendered against Liberty. Under the provisions of LSA-C.C.P. Article 2133 above quoted, the plaintiff's answer was equivalent to an appeal on his part only from that portion of the judgment rendered against him in favor of Liberty and which he complained of in his answer. His only complaint as to the judgment against Liberty was the inadequacy of the damage award. Consequently, we cannot grant the relief which he asked for as to the intervenor's award.

CONCLUSION
The judgment of the trial court is affirmed. Each party to bear his own cost of the appeal.
AFFIRMED.
NOTES
[1] The accident happened prior to the amendment to the Louisiana Workmen's Compensation Act restricting suits against executive officers. See Act 147 of 1976; LSA-R.S. 23:1032. The state court trial was apparently delayed pending the outcome of an action filed in federal court.