Statement of Facts.

## JOSEPH LENTZ v. CARNEGIE BROS. & CO.

APPEAL BY DEFENDANTS FROM THE COURT OF COMMON PLEAS
OF WESTMORELAND COUNTY.

Argued October 6, 1891—Decided January 4, 1892.
[To be reported.]

1. One who is engaged in the manufacture of coke from coal slack, not mined upon the land which is the seat of such manufacture, is responsible in damages to a lower riparian proprietor for the pollution of a stream as an incident of the washing of the slack, in preparation for its use in making coke therefrom: Robb v. Carnegie, ante, 324.

(a) In an action to recover damages for dumping into a stream materials carried down by the water and deposited on plaintiff's land, the defendants pleaded the statute of limitations. It appeared that such a dumping and deposit of materials was begun seventeen years before the bringing of the suit, and had gone on continuously thereafter: ✦

2. For the purpose of providing a measure of damages, it was error to admit testimony contrasting the value of the plaintiff's property, as in its original condition, with its value in the condition existing when the suit was brought. The question was, to what extent had the defendants made its condition worse within the six years preceding the suit.

3. Moreover, the mode of estimating damages applicable to cases of taking under the power of eminent domain, is not ordinarily applicable to actions of trespass. For an injurious trespass, the measure of damages is the cost of remedying the injury, unless that equals or exceeds the value of the thing injured, when such value becomes the measure.*

4. A witness, who in his direct examination has put a value upon a farm, may be asked upon cross-examination, for the purpose of testing his knowledge and his fairness as a witness, whether he does not know of particular sales of other farm lands in the same neighborhood, at certain prices below that fixed by him in his estimate.

Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, MC-COLLUM and MITCHELL, JJ.

No. 129 October Term 1890, Sup. Ct.; court below, No. 202 May Term 1888, C. P.

On March 8, 1888, Joseph Lentz brought trespass against

---

* Cf. Clark v. Railroad Co., ante, 438 ; Gallagher v. Kemmerer, 144 Pa. 509 ; Duffield v. Rosenzweig, 144 Pa. 520.

Carnegie Brothers and Company, Limited, to recover damages for injuries to the plaintiff's land, alleged to have been caused by acts of the defendants. The defendants pleaded not guilty and the statute of limitations. The plaintiff gave notice that he would claim damages to the date of trial: See act of May 2, 1876, P. L. 95.

At the trial, on June 2, 1890, the following facts were shown:

In 1862, the plaintiff became the owner of a farm of seventy-three acres, in North Huntingdon township, Westmoreland county, lying on both sides of Brush creek and at a bend in that stream. The defendants, in 1871, erected the coke works described in Robb v. Carnegie, ante, 324, at a point about one mile further up the creek, and subsequently enlarged them by erecting additional ovens. The works were operated with coal slack, brought by rail from various mines in the neighborhood. Before using it in the ovens, the defendants washed it to remove impurities. The slate, sulphur, horseback, etc., washed out of the slack, as well as the ashes left in the ovens after the drawing of the coke, were carried to and dumped into the creek. In long, dry seasons, when there was insufficient water in the creek to carry off the refuse, it would accumulate in large quantities, the accumulations being carried down the stream later, when the water would rise.

After the erection of the defendants' ovens there was a gradual change in the channel of the creek through the plaintiff's land, the creek bed being filled up by the deposit of slack, slate, gravel, etc., with some coke, and the water thus forced over upon the adjoining land of the plaintiff, washing away a part of his orchard and garden. The refuse matter carried down the stream was spread by high waters over seven or eight acres of the plaintiff's land, rendering that part of it unfit for cultivation. The water of the creek was so polluted as to be unfit for use, as the result of the washing of the slack at the defendants' works.

Testimony for the defendants tended to show that much of the material brought down the stream came from collieries situated above the coke works ; that the deposits on the plaintiff's land, or most of them, were caused by extraordinary floods, which tore out many of defendants' ovens and washed all the coke and ashes from their yards; that the coke found upon

plaintiff's land came from the wreck of a large coke train; and that the waters of the creek had been polluted for twenty-five years, by sulphur water discharged from mines situated up the stream.

A large amount of testimony was given upon the question of damages, some of which is herewith presented:

William Robb, having testified for the plaintiff that the deposit on plaintiff's land was mixed up with the soil, from twenty-two to twenty-three inches deep, and therefore it would be impossible, in the judgment of the witness, to remove the deposit from the land without taking soil and all, which would leave the ground worthless for cultivation, that the witness lived in the neighborhood, had known the plaintiff's farm since before the deposit came upon it, and that he knew of sales of real estate in that locality and the prices paid therein, was asked:

" Q. What was his farm worth ; or what would it be worth in your opinion, and unaffected by this deposit, at the present time."

The question is asked for the purpose of showing the depreciation in value of the plaintiff's farm, by reason of the deposit placed upon it from the defendants' coke works.

To this offer counsel for the defendants object for the reason that the plaintiff has failed to draw from the witness on the stand such knowledge as brings the witness within the rule whereby he would be able to give in round numbers the damage sustained by the plaintiff, caused by the defendants; that he has failed to give any instances of sales of real estate in the neighborhood, simply stating that he has known of sales without giving the names of the parties, or how close the sales were to this land; nor has he stated, or even given any particular evidence of the injury done to this land, either by giving the value of the land, the crops that it would raise, or injury of any kind whatever that it has particularly and specifically sustained; which prevents him and excludes him under the rule of law laid down, expressing the knowledge which qualifies a witness to give evidence in such cases as the one now before the court.

By the court: Objection overruled ; exception.[2]

The witness then testified that the farm as a whole was

worth one hundred dollars per acre, unaffected by the deposit, but that as affected by the injury it would not bring two thousand dollars as a whole, and was depreciated five thousand dollars.

J. L. Brown testified that he was a landowner, knew of sales of land in the neighborhood, and had heard the prices paid therein.

" Q. Well, now, will you state to the court and jury what this land of Mr. Lentz's was worth in the market; what its market value was, or is to-day, unaffected by these deposits ? "

Objected to by defendants' counsel, because the witness has not shown sufficient knowledge of market values to enable him to give his opinion.

By the court: Objection overruled; exception.[5]

The witness stated that the farm would be worth, unaffected by the injury, from one hundred dollars to one 'hundred and twenty-five dollars per acre, and that as so affected it was worth from forty dollars to fifty dollars.

John Nehrig was asked:

" Q. You have heard of the sales in that neighborhood? A. Yes, sir. Q. And you have heard of the prices,—don't tell me them, but you have heard what they were ? A. I have heard them. Q. How much land have you got there ? A. I have got forty-two acres. Q. What would this farm of Mr. Lentz's be worth without the cinders and slate on it, to-day, in the market ? "

Objected to, because the witness has not shown himself competent to give an opinion.

" Q. Do you know the general selling price of farms and lots and everything; the general price of land, without giving any particular instance, down around there ? A. Well, they are different prices as I said before. Q. Certainly they are different prices, but you know the different prices, something about them, do you? A. Some sales —— Q. You do not understand me; listen to my question; do you know the general prices in the neighborhood; I do not care about particular prices of a lot or farm, but the general prices; you know something about that, do you? A. The general price is about a hundred and a hundred and fifty dollars."

By the court: I think the witness has shown himself competent; exception.[6]

Charge of Court below.

" Q. Taking Mr. Lentz's farm as it is to-day there, put it on the market, without this slate, and coke, and cinders on it; suppose that was not on it, what would it be worth in the general market down there to-day? A. To-day it would fetch a hundred and fifty dollars an acre. Q. It would be worth a hundred and fifty dollars an acre? A. Yes, sir. Q. Now what is it worth, if put on the market at the present time as affected by this deposit on it? A. It would take it busy to fetch fifty dollars."

On cross-examination, this witness mentioned a number of farms as having been sold, within his knowledge, between 1883 and 1890.

" Q. Don't you know that the most paid for any of these farms was fifty-five dollars an acre, and the least twenty-five dollars an acre?"

Objected to by plaintiff's counsel as impertinent, irrelevant and not proper cross-examination, in that the counsel inserts in his question the price of the lands, which would involve an investigation into each individual sale to ascertain whether it was a fair market sale, a forced sale, the sale of an undivided interest, or in fee.

To which defendants' counsel reply that this will be followed by evidence showing that these were sales in the open market, and without compulsion so far as the owners of the property were concerned.

By the court: Objection sustained; exception.[7]

Barney Rowe, after stating that he had heard of a good many sales in the neighborhood of the plaintiff's land, had heard something of the value of real estate there, and knew the plaintiff's farm, testified, under exception,[8] that its value was depreciated by the injury from one hundred and fifty dollars to between forty dollars and fifty dollars per acre. Testimony for the defendants tended to show that the damages claimed by the plaintiff were exaggerated and extravagant, and that the deposits upon his land could be removed at a small cost.

The testimony being closed, the court, DOTY, P. J., charged the jury in part as follows:

The plaintiff maintains that at the time of the purchase of this property Brush creek had a well defined channel, and that

no one else, to his injury, had a right to divert the course of the stream, or to poison or pollute the waters thereof. He relies upon an ancient maxim of the law, that one must enjoy his own property in such manner as not to injure that of another. This rule gave to the plaintiff a right to the enjoyment of the stream flowing in its natural course over the surface of the land. Each proprietor of the land along Brush creek had an equal right to the advantage of the stream flowing in its natural channel; to the use of the water so as not to diminish its flow upon the other owners along the banks, and so as not to pollute the water and thus render it unfit for use by others; but no proprietor along this stream had any right to deposit foreign and injurious materials in the creek, in such a way that the ordinary current of the water or the usual rises following an ordinary rain would carry the same upon his neighbor below; and if such deposits were made, and substantial injury resulted, an action would lie to recover compensation for such injury.

Nor, would the defendants herein, unless they occupy an exceptional position, be free from responsibility in such a case. They contend, however, very earnestly, that their position is exceptional; that they are engaged in a lawful business; that the manufacture of coke is a necessary and important industry; that all that was done by them was necessary and proper in such manufacture; that they were not guilty of negligence, and that there is no evidence of malice on their part. Now, all these admissions may be made without necessarily arriving at the conclusion to which the defendants direct us. If the coal were mined by the defendants at their plant on Brush creek, and the water of the mine naturally and necessarily flowed into the creek, without negligence or malice on the part of the defendants, those who suffered along the stream below would be without remedy by action. Such a rule, or rather, such an exception to the general rule, is made necessary in this state, in order not to hamper or destroy the industries engaged in the development of the natural resources of the country. But, the exception must not be carried beyond the exigencies of each particular case.

The contention here is, that necessarily slack must be washed; that necessarily the stream must be polluted; that of necessity

the deposits must be made, and from the very necessity of the case, it is probable that some one in the vicinity of the coke plant will be injured by the smoke, by the pollution of the water, or from other causes incident to such manufacture. But, [in principle, we can see no difference between the manufacture of coke and any other offensive or injurious trade or manufacture. In other words, there is nothing in the nature of the coke industry to give it exceptional privileges over other industries, necessarily offensive or dangerous. It is true that it is a necessary and useful industry. If manufactured at the point where the coal is mined, it may be admitted, for the purposes of this case, that the slack could be washed, streams polluted, deposits made; and if done without negligence or malice, any injury done thereby would be damnum absque injuria. But such is not this case. The plaintiff bought his land, according to the testimony, in 1862, about twenty-eight years ago. Eleven years afterwards, or in 1871, according to the testimony, the defendants located their plant on the waters of Brush creek, about a mile up the stream from the land of the plaintiff. The raw material from which the coke is manufactured is not mined at this point, but is shipped from other places at various distances from the coke plant; the product also, is shipped away to market. The place selected for the manufacture is distant, therefore, both from the place of production of the raw material and from the market where the product is sold. Selecting such a location, as we view the law, the defendants are not in a position to claim exemption from the rule which requires them to use their own property so as to cause no injury to another; and if they did so use it, they would be liable for whatever injury they caused to plaintiff's land for six years prior to the commencement of this suit.]⁹ . . . . .

We are now to call your attention to several matters of fact which we conceive it to be your particular duty to pass upon and decide.

The first question is, to what extent has the plaintiff's property been injured? There seems to be no serious contention but that some injury was done to the plaintiff's property by some person at some time. The plaintiff alleges that six or eight acres, as we have already indicated, were absolutely le-

stroyed; that these acres were out of the very centre or heart of the farm, and that the destruction of these six acres depreciated the market value of the entire farm. On the other hand, it is contended by the defence that this injury was not nearly so great; that there was but a slight deposit of coke or other foreign material upon the north side of the tract, which we understand to be larger; and upon the south side thereof, there was not more than an acre and a half of the land that was rendered unfit for cultivation. There has been a great deal of testimony taken upon this question of fact, as well as some other questions that are present in the case, and we will refer very briefly, by way of refreshing your recollection, to the general run of the testimony upon the one side and upon the other. . . . .

The defendants, however, at this stage of the case, contend very earnestly that if liable at all for an injury, it is for a very small part of the damage you may find the plaintiff has sustained. . . . . Now, if you find, under the evidence, the extent of the plaintiff's injury, and what part, if any, the defendants were responsible for, you will next turn your attention to the question, how much of this injury if any has been caused to the plaintiff's land within six years before the commencement of the suit. . . . . If you pursue the method of investigation that we have indicated, in their order, you will determine three questions: The extent of the plaintiff's injury; how much, if any, was caused by the defendants, and how much, if any, was done in the last eight years, six years before the commencement of the suit?

After deciding these questions there may remain one, namely, what damage, if any, has the plaintiff sustained? He claims for a permanent injury to his farm. To illustrate the damage, he has shown an orchard injured by sulphur or coke killing the trees, and by the waters washing trees away; that his fences have been swept away. The injury to the fences, however, was more than eight years ago. We have tried to recall some testimony to fix precisely when the trees were injured or swept away, but we have not been able to discover the precise time; but that is a matter for you. The real injury complained of is the permanent and substantial injury to his premises. He claims for a depreciation in the market value of his property;

Charge of Court below.

that from six to eight acres in the heart of his farm have been ruined, and that the value of the whole has depreciated in the market. This is a question to which you will particularly direct your attention. What is the difference in the value of this land with and without the deposit caused by the defendants within six years prior to the bringing of the suit? This is the true measure of damages in this case, unless the cost of removing the deposit, and placing the premises in the same position as before the injury, would be less than the difference in the value of the land. If less, this would be the measure; this would be the amount that ought to be awarded to the plaintiff. As we have already indicated, compensation is the rule. The plaintiff, if entitled to any damage, is entitled only to such damage as will compensate him for the injury he has suffered. If the deposit can be removed and the plaintiff placed in the position he was in on the eighth of March, 1882, for less than the land has depreciated in value, he ought to be awarded only sufficient to place him in such position. . . . . .

The plaintiff requests the court to charge:

3. We instruct you that it was incumbent upon the defendants to provide a dumping ground for the refuse material from their coking plant, and to deposit the same in such manner as in no way to interfere with the flow of the water in Brush creek, and so as to do no injury to the lands of the plaintiff; and this is especially true, if you believe from the evidence there is other land which could be procured, in the vicinity of the coke ovens, upon which the said refuse material could be deposited.

Answer: The defendants have no legal right to dump slack or other material into the creek; and if you find that that has been done to the injury of the plaintiff, the defendants will be liable for whatever damage was caused by them to the land of the plaintiff.[12]

4. The plaintiff is entitled to the use and enjoyment of the waters of Brush creek, as it naturally flowed through his land, undiminished and unpolluted; and if the jury believe that the water of said stream has been polluted by reason of the defendants having allowed the filth from their washer and coke yard to pass into the stream, and the plaintiff has been thereby deprived of the ordinary use and enjoyment of the water of said

Charge of Court below.

stream, he would be entitled to your verdict for such amount as would compensate him for the injury thus sustained from the eighth of March, 1882, down to the present day.

Answer: This point is affirmed.[13]

5. If the jury believe that the channel of Brush creek has been filled up by reason of the slate and other refuse material from the coke ovens deposited in the channel of said stream by the defendants; and that by reason thereof the channel of said stream has been changed, and the plaintiff's orchard washed away, the plaintiff will be entitled to your verdict for such amount as would compensate him for the injury thus sustained from the eighth of March, 1882, down to the present time.

6. If the jury believe that the lands of the plaintiff have been permanently injured by reason of the filth thrown into the stream by the defendants, and carried down by the ordinary action of the water to and upon the land of the plaintiff, we instruct you that the proper measure of damage would be the difference between the market value of the plaintiff's farm, as unaffected by the alleged nuisance, and the market value of the said farm, as affected by the said alleged nuisance.

7. We instruct you that in making the estimate of the damage sustained by the plaintiff, you will take into consideration the value of the land actually destroyed, the loss of crops from the eighth of March, 1882, to the present time, the destruction of his orchard, the damage to his fences and his dwelling-house, and the injury that resulted to him from the pollution of the water by the coke works, and the additional expense caused to plaintiff for the purchase of grain, feed, etc., by reason of the above deposit, and any other injury resulting therefrom; and allow him such a verdict as will compensate him for the damage sustained from eighth of March, 1882, down to the present time.

Answer: The correct measure of damage is stated in the sixth point, and with this qualification this point is affirmed. The fifth and seventh points are refused.[15]

The defendants request the court to charge:

2. The defendants are engaged in a lawful business; and if you believe they have selected a judicious location therefor, the plaintiff cannot recover in this action, unless he has satisfactorily shown that the defendants have operated their works with negligence, unskilfulness or malice.

Charge of Court below.

Answer: this point is refused.[16]

3. If you believe the defendants have chosen a secluded place for the erection of their ovens, where as few persons may be inconvenienced as possible, and in the manufacture of coke from coal slack it was necessary to remove the sulphur and other impurities by washing it, and if in such washing the water was polluted and flowed by gravity in the channel of Brush creek through the plaintiff's property, in such condition making it unfit for any use to which he might desire to apply it, then we instruct you that such pollution of the water is damnum absque injuria, and on that branch of the plaintiff's case your verdict must be for the defendants.

Answer: Under the evidence in this case this point is refused.[17]

4. If the evidence satisfies you that coal slack, slate, and coke, from collieries above defendants' works as well as other causes beside, sand, stone and gravel, combined in the injuries alleged to have been sustained by plaintiff, and the plaintiff not having proved the injury committed by defendants alone, you will be warranted in finding a verdict only for defendants' proportionate share of the damage.

Answer: This point is affirmed.*

6. The undisputed evidence is that the defendants were and are pursuing a lawful business upon their own premises; and if any substance passed down the stream from their works, which was mingled with the same or like materials from collieries, embankments and other sources, as well as with stone, sand, gravel and other débris, and all were together deposited on plaintiff's land, in the time of the flood which was shown to have visited Brush creek in 1888, there can be no recovery under those circumstances.

Answer: If the whole injury were caused by the extraordinary flood of August, 1888, the defendants would not be liable. The defendants are only accountable for the injury caused by their own acts, and not by the acts of others working concurrently. With this understanding the point is affirmed.[18]

7. If the materials coming from the defendants' works mingled with the same or like materials from collieries and other

---

* See Gallagher v. Kemmerer, 144 Pa. 509.

Arguments.

sources, and with gravel, stone, sand and other débris, were deposited in ordinary freshets, the defendants are liable only for such material as came from their place, and not that which came from other sources; and it is incumbent on the plaintiff to distinguish between that which came from the defendants' works and that which came from all other sources, before he can recover at all.

8. The evidence on the part of the plaintiff as well as the defendants, is that the deposit composing the bar on the south side of the creek opposite the plaintiff's house and orchard, consists of stone, gravel, sand, slack, slate and some coke; and that said deposit or bar has changed the course of the stream, changing the character of some of plaintiff's land, and causing some débris to be thrown upon the south side of the creek; and we instruct you that the plaintiff cannot recover in this action unless he shows how much material coming from defendants' place, distinguished from other substances, has caused the said deposit or bar.

Answer: As we have already instructed you, the defendants are only liable for the injury that they themselves occasioned, and they would not be liable for injury occasioned by others. With this understanding, the seventh and eighth propositions are affirmed.[19]

—The jury returned a verdict for the plaintiff for $1,700. A rule for a new trial having been discharged and judgment entered, the defendants took this appeal, assigning inter alia for error:

2, 5, 6, 8. The admission of plaintiff's offers.[2] [5] [6] [8]

7. The refusal of defendants' offer.[7]

9. The part of the charged embraced in [ ][9]

12, 13, 15. The answers to plaintiff's points.[12] [13] [15]

16–19. The answers to defendants' points.[16 to 19]

*Mr. John F. Wentling* and *Mr. Paul H. Gaither* (with them *Mr. J. A. Marchand* and *Mr. David A. Miller*), for the appellants.

1. The defendants have been held liable in damages, because, in the lawful operation of their works, they have added to the impurities of water that was already befouled and totally unfit for use. The doctrine of Tinicum Fishing Co. v. Carter, 90

Pa. 89, renders further discussion in this connection unneces-
sary. We claim that whatever injury results from the lawful
operation of an industry, located in a mining region and hav-
ing for its object the conversion of raw minerals into man-
ufactured products, is damnum absque injuria, and for any
fouling of the stream that was the necessary result of their
manufacturing business, the defendants are not liable: Penna.
Coal Co. v. Sanderson, 113 Pa. 126; Commonwealth v. Miller,
139 Pa. 77; Penna. etc. R. Co. v. Walsh, 124 Pa. 544; 3 Bl.
Com. 217; Railroad Co. v. Yeiser, 8 Pa. 366; Phila. etc. R. Co.
v. Yerger, 73 Pa. 121; Erie Ry. Co. v. Decker, 78 Pa. 293;
Reading, etc. R. Co. v. Latshaw, 93 Pa. 449; Albert v. Railroad
Co., 98 Pa. 319; Price v. Grantz, 118 Pa. 413; Penna. R. Co.
v. Marchant, 119 Pa. 541; Delaware, etc. Canal Co. v. Gold-
stein, 125 Pa. 246.

2. In the part of the charge assigned for error, the court
improperly assumed and said to the jury that the business of
the defendants was "necessarily offensive or dangerous," there-
by classing this case with Penna. Lead Co.'s App., 96 Pa. 126.
This manner of charging a jury has been condemned: Price v.
Grantz, 118 Pa. 413. The court also had a wrong idea as to
the legal effect of the selection by the defendants of a location
for their operations. The rule laid down is entirely too strin-
gent, and if sustained by this court, will be the death knell of
industrial activity in this country. The defendants, if liable
at all, were liable for such injuries only as were caused by their
own acts; and it was incumbent on the plaintiff to distinguish
between what came to his land from their works, and what
came from other sources, before he could recover at all: Little
Schuylkill Co. v. Richards, 57 Pa. 147; Seely v. Alden, 61 Pa.
306; Leidig v. Bucher, 74 Pa. 69. The defendants' seventh
and eighth points should therefore have been affirmed without
the obscuring qualification which was added to them.

*Mr. E. E. Robbins* (with him *Mr. D. S. Atkinson, Mr. John
M. Peoples* and *Mr. John E. Kunkle*), for the appellee:

This case is ruled by the principles explained, examined and
discussed in Collins v. Gas Co., 131 Pa. 143, s. c. 139 Pa. 121.
The doctrine that one who throws coal dirt and other impuri-
ties into a stream, and permits them to be carried down by the

action of the water and deposited on the land of another, is responsible in damages therefor, has been recognized and applied in the following cases: Little Schuylkill Co. v. French, 81* Pa. 370; Howell v. McCoy, 3 R. 268; Horton v. Hall, 1 Penny. 159; McCallum v. Water Co., 54 Pa. 58; Hanover Water Co. v. Iron Co., 84 Pa. 284; Seely v. Alden, 61 Pa. 306; Sanderson v. Coal Co., 86 Pa. 408, 113 Pa. 143; Bushnell v. Proprietors, 31 Conn. 150. This is not an instance of a mine located by nature on the banks of a stream, as in the Sanderson case, but of a coking plant located by the defendants on a railroad and creek for their own convenience, using coal collected from many mines and brought to the ovens by rail. There is no necessity for casting refuse into the creek; a dumping ground could be provided for it. Nor is it shown that washing the slack is a necessity to the business. The defendants had a right to such use of the water of the creek as they could make, without materially diminishing its quantity, or corrupting its quality; but no greater right. And it matters not whether the water came flowing by the coke works in a pure condition or not; the defendants are answerable for such impurities as they added; and on this branch of the case the court below was especially clear and careful in the charge.

OPINION, MR. JUSTICE WILLIAMS:

The questions raised by this appeal are substantially those which were considered and decided in the recent case of Robb v. Carnegie, ante, 324, in which an opinion was filed on the first day of the present term. The conclusions reached in that case require us to sustain the second, fifth, sixth, eighth, and fourteenth assignments of error, all of which relate to the measure of damages.

The plaintiff is the owner of a farm containing seventy-three acres and lying on both sides of Brush creek. It is mainly upland. The flat along the stream is quite narrow, and covers not more than seven or eight acres, including the bed of the stream. The defendants own and operate an extensive coke works, situated on the bank of the stream a little more than one mile above the plaintiff's farm, at which the slack is collected from several coal mines in the region, and used for making coke. The plaintiff alleges that the defendants habitually

put the ashes from their ovens and their refuse slate and slack into the stream, using it as a dumping ground, and depending on the current and the floods to carry it away. By this means the water is polluted, and rendered unfit for use; the channel is choked up, the water is crowded out of its original bed, and the flat cut up and covered with a deposit of ashes, slate, and refuse from the coke works, so that it is unfit for cultivation. For the injury thus sustained, as the result of the unlawful use made of the stream by the defendants, the plaintiff seeks to recover in this action. The defendants reply that the pollution of the stream began before their works were erected, as the result of mining operations on Brush creek and its tributaries, which were in progress more than twenty years before this suit was brought. They say that their own works were erected in 1871, and have been in operation since that time without objection or complaint until now; that the condition of the stream and the plaintiff's land has undergone no material change for many years, and if their present condition is to any extent chargeable to the acts of defendants or their employees, no recovery can be had in this case except for injury done within six years before suit was brought.

The questions thus presented to the jury were, in the first place: What was the condition of the stream and the plaintiff's flat land six years before the writ was issued? Was the water then polluted? Was the channel choked with refuse and the flat cut by the water, and covered with the deposit complained of? Having ascertained what the situation then was, they were next to inquire whether the situation had been made worse during the six years. If so, in what respect, and to what extent? In this way they would be able to reach a correct conclusion as to the extent of the injury done the plaintiff, for which he could recover in this action. The method adopted on the trial was quite different. The plaintiff was permitted to show, and the jury was instructed to consider, what the plaintiff's farm would be worth as a whole, including the buildings and improvements, with the creek and the flat land in the original condition as it was before the work of pollution began, and what it was now worth, with the stream and the flat in their present condition; so that the difference between these estimates became the measure of damages.

Opinion of the Court.

We held in Robb v. Carnegie, supra, that this mode of esti-
mating damages, which is properly applicable to cases where
an entry is made under the power of eminent domain, is not
ordinarily applicable to actions of trespass. It is not necessary
to repeat the reasons which were given in support of that con-
clusion. It is enough to say that we adhere to them. In case
of a taking, the natural inquiry is, how is that which is left
affected by the taking? Where nothing is taken, but an inju-
rious trespass is alleged, the question is, what will be the cost
of restoring the thing injured to its former condition? If the
cost of restoration will equal or exceed the value of the thing
injured, then the value becomes the measure of the plaintiff's
damages. But there is still another reason why the measure
of damages adopted in the court below was inapplicable to this
case. The defendants had pleaded the statute of limitations,
and the inquiry was thereby limited to six years. The com-
parison which the testimony placed before the jury carried
them back to a time when the stream was not polluted, and
the slate and slack had not been deposited on the plaintiff's
land. It brought to their notice, not the injury done in six
years, but the changes made from the beginning of operations
on Brush creek, which was nearly or quite a quarter of a cen-
tury before the trial. While the learned judge told the jury
that the plaintiff could not recover for an injury sustained
more than six years before his action was begun, he permitted
testimony to be given which brought the entire change in the
situation of the plaintiff's flat land to their attention, and
which contrasted its value, if in its original condition, with
its value in its present condition. This evidence was admitted
after objection, and for the purpose of providing the jury with
a measure of damages in this case.

The seventh assignment of error is also sustained. The
witness had put a value upon the plaintiff's farm. The de-
fendants had a right to test his knowledge and his fairness as a
witness, upon cross-examination. For this purpose it was pro-
per to ask him if he did not know of sales of farm lands in the
same vicinity, at a much less price than he had put upon
the farm of the plaintiff. If he did know of such sales, but
disregarded them in fixing the price of the plaintiff's land,

Syllabus.

that circumstance was calculated to affect his credibility, unless it was explained to the satisfaction of the jury.

> The judgment is reversed, and a venire facias de novo is awarded.