535 A.2d 729

David and Joanne Alburger, et al., Appellants *v.* Philadelphia Electric Company, Appellee.

Argued June 9, 1987, before Judges CRAIG and DOYLE, and Senior Judge BARBIERI, sitting as a panel of three.

*James M. Neill,* for appellants.

*Jeffrey S. Saltz,* with him, *Bernard Chanin, Wolf, Block, Schorr and Solis-Cohen, and Robert W. Valimont, Power, Bowen & Valimont,* for appellee.

OPINION BY SENIOR JUDGE BARBIERI, January 12, 1988:

This is an appeal by sixteen landowners[1] from an order of the Court of Common Pleas of Bucks County denying their motion for summary judgment and granting the motion of Philadelphia Electric Company (PECO) for summary judgment. Appellants sought to enjoin PECO's use of the upper reaches of the East Branch of

---

[1] David Alburger; Joanne Alburger; Mervin Bryan; Nancy Bryan; John Cressman; Pamela Cressman; Bernard Delin; Susan Delin; Mark Dornstreich; Judy Dornstreich; Michael Ingram; Margaret Ingram; James Petzold; Mary Kay Petzold; Ely Swisher; and Marguerite Swisher.

the Perkiomen Creek as a conduit to transport Delaware River water to PECO's nuclear power generating station in Limerick, Montgomery County.

The facts of this case, as stipulated by the parties, are as follows. Appellants are riparian owners of lands along the upper reaches of the East Branch of the Perkiomen Creek in Bucks County. From its source to Sellersville, Bucks County, approximately seven or eight miles, the East Branch is nonnavigable. PECO owns approximately forty acres of land along the upper reaches of the East Branch and is also a riparian owner. In 1982, PECO obtained a permit to construct an outfall on its land from which it planned to discharge Delaware River water into the East Branch.[2] PECO's use of the East Branch as a conduit is an integral part of its portion of the Point Pleasant Water Diversion Project.[3]

---

[2] This Court affirmed the grant of a permit to PECO to construct this outfall in *Del-AWARE Unlimited, Inc. v. Department of Environmental Resources,* 96 Pa. Commonwealth Ct. 361, 508 A.2d 348 (1986), *allowance to appeal denied,* 514 Pa. 644, 523 A.2d 1132 (1986).

[3] The Point Pleasant Water Diversion Project is designed to divert water from the Delaware River for use as drinking water for drought-prone portions of Bucks and Montgomery Counties and as a back-up supply of cooling water for PECO's Limerick nuclear power generating station. Under the project, water would be drawn from the Delaware River at a pumping station at Point Pleasant and pumped through a 2.5 mile pipeline to Bradshaw Reservoir, a facility to be constructed by PECO in Plumstead Township, Bucks County. Once pumped to Bradshaw Reservoir, the water would be divided between the municipal water authorities for use as drinking water and PECO. PECO's share of the water would then be pumped through a 6.7 mile pipeline to an outfall located on the headwaters of the East Branch of the Perkiomen Creek. PECO's share of the water would then flow along the natural course of the East Branch and the main stem of the Perkiomen Creek 22.2 miles to a pumping station located near Graterford, Montgomery County. The water would then be drawn from the Perkiomen Creek at

In its natural state, the upper reaches of the East Branch has a median flow of approximately 1.4 cubic feet per second (cfs) and during the summer months it is often reduced to a series of shallow pools connected by a trickle of water running through rocks in the creek bed. There are, however, periods when the flow in the upper reaches of the East Branch increases substantially, particularly after storms.[4] PECO would discharge approximately 71 cfs of Delaware River water into the East Branch from its outfall, thus raising the median flow to at least 71 cfs.

Appellants, downstream riparian landowners, commenced an action in equity in common pleas court to enjoin PECO's proposed discharge of Delaware River water into the East Branch. In the alternative, they sought to require PECO to condemn a right-of-way for its water flow and pay just compensation prior to commencing any discharge of water. Affidavits and Requests for Admissions were filed and answered and both parties moved for summary judgment. The Honorable OSCAR S. BORTNER, of the Court of Common Pleas of

---

Graterford and pumped through a pipeline to the Limerick plant. *See also Del-AWARE Unlimited, Inc. v. Pennsylvania Public Utility Commission,* 99 Pa. Commonwealth Ct. 634, 513 A.2d 593 (1986), *allowance to appeal denied,* 515 Pa. 587, 527 A.2d 547 (1987); *Sullivan v. County of Bucks,* 92 Pa. Commonwealth Ct. 213, 499 A.2d 678 (1985)

[4] In *Del-AWARE Unlimited, Inc. v. Department of Environmental Resources,* 96 Pa. Commonwealth Ct. 361, 508 A.2d 348 (1986), *allowance to appeal denied,* 514 Pa. 644, 523 A.2d 1132 (1986), we noted that the accepted flow of the East Branch in this area is approximately 2 feet per second (fps) and increases as high as 7 to 10 fps during floods. *Id.* at 376-77, 508 A.2d at 357. While we upheld the granting of PECO's outfall permit by DER, that decision was based on environmental issues pertaining to possible erosion damage to the downstream riparian owners. The property rights at issue here were not involved in that case.

Bucks County, found that PECO's proposed discharge of Delaware River water into the East Branch was a proper riparian use, denied Appellants' motion for summary judgment and granted PECO's motion for summary judgment. *Alburger v. Philadelphia Electric Company*, 50 Bucks 24 (Pa. C.P. 1986). This appeal followed.

The sole issue presented by this appeal is whether an upstream riparian owner has the right to discharge water into a nonnavigable waterway when that water is not generated on that owner's land but is imported in large quantities from an entirely separate and unrelated water course system and when the volume of that non-riparian water will increase the median flow by more than fifty times the present median flow rate. Appellants claim here, not surprisingly, but contrary to the view of the common pleas court, that such importation of non-riparian water to be discharged into their water course is not a riparian right of PECO. We agree.

At the outset, we are cognizant that under Pa. R.C.P. No. 1035(b) summary judgment may only be granted where there are no genuine issues of material fact and the record, viewed most favorably to the non-moving party, reveals that the moving party is entitled to judgment as a matter of law. *Dowlin v. Coatesville Area School District*, 22 Pa. Commonwealth Ct. 443, 350 A.2d 190 (1975). *See also* Goodrich-Amram 2d §1035(b):2 (1976). As the material facts were stipulated to by the parties through the Request for Admissions and the Answer of PECO thereto, the matter is ripe for summary judgment. We are also cognizant that summary judgment may only be granted in the clearest of cases. *Kotwasinski v. Rasner*, 436 Pa. 32, 258 A.2d 865 (1969).

As noted by the common pleas court, the question of whether a lower riparian owner has a right to enjoin an upper riparian owner from raising the level of a water course and increasing its flow by discharging into the

water course additional water, here imported and non-riparian water, is one of first impression in this Commonwealth. Our research into the area of the riparian rights doctrine convinces us that Pennsylvania is one of the "reasonable use" jurisdictions. *See* Butler, *Allocating Consumptive Water Rights in a Riparian Jurisdiction: Defining the Relationship Between Public and Private Interests,* 47 U. Pitt. L. Rev. 95, 102 n. 13 (1986). In a "reasonable. use" jurisdiction, such as Pennsylvania, a riparian owner is entitled to use so much of the water that flows through his land as may be reasonably necessary for domestic needs or similar purposes. *See e.g., Brown v. Kistler,* 190 Pa. 499, 42 A. 885 (1899); *Pennsylvania Railroad Company v. Miller,* 112 Pa. 34, 3 A. 780 (1886). The only limitation on this use is that the reasonable use made by a riparian owner of the water course must not materially diminish its quantity or quality. *See e.g., Lentz v. Carnegie Brothers & Co.,* 145 Pa. 612, 23 A. 219 (1892); *Clark v. Pennsylvania Railroad Co.,* 145 Pa. 438, 22 A. 989 (1891). Subject to the right of reasonable use by other riparian owners, a riparian owner has a right to have the natural flow of a water course reach his land in its natural channel and in its natural condition. *See e.g., White v. Pennsylvania Railroad Co.,* 354 Pa. 397, 47 A.2d 200 (1946); *Beech v. Kuder,* 15 Pa. Superior Ct. 89 (1900). While there is no reported case of a downstream riparian landowner being able to enjoin an upstream riparian owner from materially *increasing* the natural flow of a water course by discharging additional waters into the water course, especially imported and non-riparian water, our review of related case law from Pennsylvania and other jurisdictions convinces us that the downstream riparian may do so.

We. begin by recognizing that we are concerned here with a nonnavigable water course. While the Commonwealth holds title to all lands underlying navigable

monwealth holds title to all lands underlying navigable waters in trust for the public, *City of Philadelphia v. Pennsylvania Sugar Co.,* 348 Pa. 599, 36 A.2d 653 (1944), title to the lands underlying nonnavigable waters is held by the owners of lands bordering such waters. *Ransberry v. Brodhead's Forest & Stream Association,* 315 Pa. 513, 174 A. 97 (1934). *See generally* Lynch, *Riparian Title in Pennsylvania,* 41 Pa. B.A.Q. 224 (1970). Thus, Appellants here are the owners of the creek bed of the East Branch as it flows across their properties. Under Pennsylvania law, however, since water is descendible by nature, an upstream riparian owner, such as PECO here, has a flowage easement over the lands of downstream riparian owners for the discharge of all waters that naturally rise in, flow, or fall upon the upstream riparian owner's lands. *See Kauffman v. Griesemer,* 26 Pa. 407 (1856); *Markle v. Grothe,* 102 Pa. Superior Ct. 90, 156 A. 585 (1931). This flowage easement enjoyed by the upstream, or dominant, owner over lands of a downstream, or servient, owner is limited to waters *naturally originating on the land of* the dominant tenement. Thus, the flowage easement PECO enjoys over the lands of Appellants does *not* include waters artificially introduced into the dominant tenement, such as the diverted Delaware River water that is to be discharged from its outflow. As stated by Associate Justice GEORGE W. WOODWARD in *Kauffman:*

> The law . . . prohibits only the immission into the inferior heritage of the waters *which would have never fallen there by the disposition of the places alone*. (Emphasis added.)

26 Pa. at 413.

Additionally, established riparian doctrine in Pennsylvania permits an upstream riparian owner to enjoin a downstream owner from obstructing a water course so that the flow is altered and the water level raised, thus

181 A.2d 277 (1962). Additionally, our courts have held that where the owner of a dominant tenement acts to greatly increase the quantity, or *artificially augments* the natural flow, of surface water flowing onto the servient tenement, the servient owner has an action against the dominant owner. *See e.g., McCormick Coal Co. v. Schubert,* 379 Pa. 309, 108 A.2d 723 (1954); *Chamberlin v. Ciaffoni,* 373 Pa. 430, 96 A.2d 140 (1953). This is also true in a number of our sister jurisdictions. *See e.g., Dayley v. Burley,* 96 Idaho 101, 524 P.2d 1073 (1974); *Poole v. Guste,* 261 La. 1110, 262 So.2d 339 (1972); *Baldwin v. Overland Park,* 205 Kan. 1, 468 P.2d 168 (1970); *Scanlan v. Hopkins,* 128 Vt. 626, 270 A.2d 352 (1970); *Jones v. Boeing Co.,* 153 N.W.2d 897 (N.D. 1967). *See generally* Comment, *Waters and Water Courses—Torts—Owners of Property Damaged by Unlawful Ditching or Unreasonable Discharge of Waters May Obtain Relief by Statute or by the Tort Concept of Reasonable Use,* 60 N.D.L.Rev. 741 (1984). In *Salisbury Township v. Vito,* 446 Pa. 200, 285 A.2d 529 (1971), the Pennsylvania Supreme Court upheld the granting of an injunction against a property owner who channeled water from a stream into a pond, increasing the water level of a pond and flooding a neighboring right-of-way. In *Salisbury Township,* the landowners were enjoined from discharging water onto the right-of-way and from interfering with the flow of the stream. While the area of law dealing with surface water is distinct from that pertaining to riparian rights, we find it illustrative to the case at bar, particularly since all parties here are the titleholders to the creek bed of the nonnavigable portion of the East Branch as it flows through their respective properties. There can be no serious question that by proposing to artificially increase the median flow of the East Branch from 1.4 cfs to 71 cfs, an increase of over fifty times the natural flow,

PECO is greatly increasing the quantity, as well as artificially augmenting, the natural flow of water over the lands of Appellants. Such an increase is outside of the flowage easement enjoyed by PECO as an upstream or dominant owner and is not a proper riparian use. Accordingly, just as the owner of an easement may enjoin an obstruction of that easement, we feel that Appellants, the owners of servient estates, have the right to seek to enjoin a dominant owner from enlarging from a foreign source the existing flowage easement and increasing the burden on their lands. Thus, the common pleas court erred when it held that PECO's planned importation and discharge of 71 cfs of Delaware River water into the East Branch was a proper riparian use and granted it summary judgment. Summary judgment should have been granted to Appellants,[5] but only with respect to that portion of their motion for summary judgment which requested that PECO be enjoined from flowing water across appellants' lands through the channel of the East Branch of Perkiomen Creek. No basis has yet been established for plaintiffs' other request that PECO be enjoined from initiating any eminent domain proceedings for the acquisition of flowage or other rights in the named channel.

We note that the appellants' Amended Complaint, in paragraph b of their request for relief, appeared to acknowledge the possibility of condemnation by their request that PECO be enjoined unless PECO first paid "just compensation for necessary interests. . . ." However, because the trial court properly declined to reach the question of eminent domain, that issue remains for

---

[5] We expressly limit the applicability of our holding to riparian owners bordering on nonnavigable water courses as they hold title to the lands underlying the water course. We express no opinion pertaining to navigable water courses where the Commonwealth holds title to the underlying lands in trust for the public.

further consideration upon remand. Of course, an eminent domain issue will exist only if, upon remand, PECO claims eminent domain powers and the appellants oppose their exercise, in accordance with the latter position taken by appellants in their motion for summary judgment before this court.

ORDER

NOW, January 12, 1988, the Order of the Court of Common Pleas of Bucks County at Docket No. 84-05370-11-5, dated August 20, 1986, is hereby reversed and this case is remanded with a direction to proceed as follows:

(1)  To grant summary judgment for the plaintiffs to the extent of enjoining the defendant from flowing any water or other materials across the lands of plaintiffs through the channel of the East Branch of Perkiomen Creek;

(2)  To consider and resolve whether the defendant has eminent domain power to acquire the necessary rights for effectuating such flow of water, by paying just compensation for them, provided that the trial court determines that the defendant proposes to proceed in that alternative manner.

---

CONCURRING OPINION BY JUDGE CRAIG:

Modern technology, which has created both the physical capability and the need to move large amounts of water from one location to another, here challenges the adaptability of common-law doctrines of riparian rights originally evolved in the context of an agrarian society.

Riparian rights rest upon the functional relationship between a watercourse and the use of the riparian land through which it flows. *See Kauffman v. Griesemer,* 26 Pa. 407 (1856). Consequently, when an upper riparian

owner draws water from another watershed, outside the riparian land, only to send it down the stream for use at a lower elevation equally unrelated to the upper riparian land, the servitude owed by lower riparian land is inapplicable. An upper riparian owner cannot use the watercourse as a mere pipeline when that owner's riparian land is neither the origin nor the destination of the water and is unrelated to any use of the water.

As the Pennsylvania Supreme Court stated in *Kauffman:*

> Almost the whole law of watercourses is founded on the maxim of the common law, *aqua currit et debet currere.* Because water is descendible by nature, the owner of a dominant or superior heritage has an easement in the servient or inferior tenement *for the discharge of all waters which by nature rise in or flow or fall upon the superior.* Hence the owner of a mill has an easement in the land below for the free passage of the water from the mill, in the natural channel of the stream, accompanied with a right to enter upon the land for the purpose of clearing out the stream, and removing obstructions to the free flow of the water. . . .

26 Pa. at 413 (emphasis added).

In accordance with the principle that the course of the natural flow is subject only to reasonable use, the lower owner has no right, for example, to obstruct the flow of the stream by a dam so as to flood the land of the upper owner. *Helms v. Zeitzeff,* 407 Pa. 482, 181 A.2d 277 (1962). Reciprocally, an upper riparian owner cannot deprive lower owners of the use of the stream by means of an obstruction or undue consumption. *Hughesville Water Co. v. Person,* 182 Pa. 450, 38 A. 584 (1897). In *Kauffman,* Justice WOODWARD pursued the subject by stating:

> This easement is called a servitude in the Roman law, and consists, says Pardessus, in the subjection of the inferior heritage toward those whose lands are more elevated to receive the waters which flow from them naturally, and quoting the Code Civil, he adds, *'this obligation applies only to waters which flow naturally, without any act of man;'* those which come either from springs, or from rain falling directly on the heritage, or even by the effect of the natural disposition of the places, are the only ones to which this expression of the law can be applied.
> . . .

26 Pa. at 413 (emphasis added).

The Supreme Court clearly makes the point that the law does not bar the upper riparian owner in any absolute way from dealing with the watercourse. The Court's dissertation confirms that the upper riparian owner is not required to leave the water untouched or unused. He may apply it to implementing the agricultural productivity of his land; in the example noted in *Kauffman*, from the earlier days of water-powered mills, he might use it to turn his mill.

However, with respect to the introduction of additional, new or foreign water, the *Kauffman* opinion further says:

> The law . . . prohibits only the immission into the inferior heritage of the waters which would never have fallen there by disposition of the places alone. . . .

26 Pa. at 413.

That key statement was not mere dictum in *Kauffman* because the facts of that case involved an upper riparian owner's digging a ditch that sent to the lower land a regular water flow that previously had been only sporadic.

The present case involves a much more egregious introduction of new water, foreign to the riparian lands. Philadelphia Electric Company (PECO) proposes to bring a large quantity of water, not merely from non-riparian land in the Perkiomen watershed, but from another watershed entirely, the Delaware River watershed; having brought it over the divide, PECO proposes to send it down Perkiomen Creek to be used solely at water plants and a nuclear plant below. The utilization of the water would have no relationship whatsoever to the use or enhancement of the riparian land itself.

Riparian doctrine clearly is founded upon the sensible principle that the central justification for imposing a servitude on lower riparian land is the rational exploitation of the upper riparian land. Accordingly, PECO's proposal here finds no support in any claim of servitude upon lower lands imposed by riparian rights law. PECO's input of imported waters simply represents watercourse usage beyond and outside of any servitude-using right ancillary to the ownership of the riparian land.

Because this analysis excludes other-watershed flows from the easement benefits of the upper riparian land only when the importation is unrelated to the use of that land, the principle so derived is not subject to an overextended interpretation which would prohibit reasonable amounts of imported water from being involved in the use of the upper riparian land. For example, on upper riparian land, useful development may involve potable water brought from a public water source elsewhere, or on that land there may be a sewage treatment plant receiving flows from elsewhere, even another watershed. If the right to discharge non-polluting effluent from such an upper riparian development should arise as an issue in the future, that case would be distinguishable because such a discharge would facilitate the actual use of the upper riparian land, unlike the case here.

Possibly PECO could purchase the new easement rights necessary for PECO's use of the watercourse as a pipeline. Or perhaps PECO could obtain such a new easement through its eminent domain powers. However, PECO cannot place a novel burden upon the riparian easement, of a nature unknown to the common law foundation that is PECO's sole claimed justification here.

Therefore, the opinion written in support of the court's judgment is correct with respect to result. This concurring opinion rejects only that opinion's citation of the surface water diversion line of cases as illustrative. Reference to such authority is not necessary, and could be misleading, because those cases do not involve legal consideration of an alleged easement specifically located by the position of a watercourse—the issue here. The present case turns upon consideration of the benefits and servitudes of easements conferred by the law of riparian rights, and that analysis leads to the conclusion that PECO's appropriation of the watercourse as a pipeline, with no functional relation to the riparian land, is devoid of a legal basis and therefore must be enjoined.

---

DISSENTING OPINION BY JUDGE DOYLE:

I respectfully dissent and would affirm the judgment of the trial court.

There is no question that this is a matter of first impression. The majority would conclude, using the language of our Supreme Court in *Kauffman v. Griesemer*, 26 Pa. 407 (1856), that a downstream riparian owner may enjoin *any* discharge of water which does not *naturally* originate, flow in, or fall upon the upstream property owner's land. The concurring opinion, would allow the reasonable discharge of imported waters into the stream bed, if the imported waters were used, or treated in some manner, upon the upstream riparian

owner's property. I am obliged to disagree with both because the appropriate legal principle to be applied, I believe, is the common law tort based "reasonable use" theory of riparian rights which would dictate a different result, and because by the application of either the majority or concurring view, (a) the unpolluted wastewaters discharged into the East Branch of the Perkiomen Creek from the public sewage treatment plant at Sellersville, could be prohibited, and (b) downstream riparians on the lower reaches of the North Branch of the Neshaminy Creek could enjoin the transmission of slightly more than half the water stored in the Bradshaw Reservoir (49 million gallons per day) by the Neshaminy Water Resources Authority (NWRA), when that public water supply (for Bucks and Montgomery counties is transmitted approximately eight miles *by the flume of that creek* to the north branch water treatement plant. *See Del-AWARE Unlimited, Inc. v. Pennsylvania Public Utility Commission*, 99 Pa. Commonwealth Ct. 634, 513 A.2d 593 (1986), *petition for allowance of appeal denied*, 515 Pa. 587, 527 A.2d 547 (1987) *(Del-AWARE/ PUC)*; *Del-AWARE Unlimited, Inc. v. Department of Environmental Resources*, 96 Pa. Commonwealth Ct. 361, 508 A.2d 348 (1986), *petition for allowance of appeal denied*, 514 Pa. 641-44, 523 A.2d 1132 (1986) *(Del-AWARE/DER)*; *Sullivan v. County of Bucks*, 92 Pa. Commonwealth Ct. 213, 499 A.2d 678 (1985). Both results are unwarranted under what I perceive to be the law in Pennsylvania and what I would urge should be the controlling legal principle.

The injury in *Kauffman* arose when the owners of certain property, the upper superior heritage, on which there was a natural spring, brought suit for damages against the owner of the lower lying ground, and the defendant, "[f]inding that the water thus introduced [by the plaintiffs] was injurious to his crops, . . . built the

sod dam across the ditch at the line fence, and this is the wrong complained of." *Id*. at 413. The Court found, on the basis of the jury's verdict for the defendant, that the ordinary flow of water from the plaintiff's spring did not reach the defendant's land, and from the topography of the land it was physically impossible that it should. To compel it to go there, the plaintiff had dug a ditch which extended at least twelve feet into the defendant's property. It was under these circumstances that the Supreme Court wrote, at length, as follows:

> Almost the whole law of watercourses is founded on the maxim of the common law, *aqua currit et debet currere*. Because water is descendible by nature, the owner of a dominant or superior heritage has an easement in the servient or inferior tenement for the discharge of all waters which by nature rise in or flow or fall upon the superior. Hence the owner of a mill has an easement in the land below for the free passage of the water from the mill, in the natural channel of the stream, accompanied with a right to enter upon the land for the purpose of clearing out the stream, and removing obstructions to the free flow of the water: Prescott v. Williams, 5 *Met. (Mass.) R*. 429.
>
> This easement is called a servitude in the Roman law, and consists, says Pardessus, in the subjection of the inferior heritage towards those whose lands are more elevated to receive the waters which flow from them naturally, *and quoting the Code Civil, he adds, 'this obligation applies only to waters which flow naturally, without any act of man;'* those which come either from springs, or from rain falling directly on the heritage, or even by the effect of the natural disposition of the places, are the only ones to

which this expression of the law can be applied.
It is not however to be understood, he goes on
still further to say, that because the flow of water
must not be caused by the act of man, that
therefore the proprietor who transmits water to
the inferior heritage, is not permitted to do any-
thing on his own land—that he is condemned to
abandon it to perpetual sterility, or never vary
the course of cultivation, simply because such
acts would produce some change in the manner
of discharging the water. The law intends not
this; it prohibits only the immission into the in-
ferior heritage of the waters which would never
have fallen there by the disposition of the places
alone. It neither would nor could refuse to the
superior proprietor the right to aid and direct
the natural flow.

Hence, for the sake of agriculture—*agri colendi
causa*—a man may drain his ground which is too
moist, and discharging the water according to its
natural channel, may cover up and conceal the
drains through his lands—may use running
streams to irrigate his fields, though he thereby
diminishes, not unreasonably, the supply of his
neighbour below—and may clear out impedi-
ments in the natural channel of his streams,
though the flow of water upon his neighbour be
thereby increased.

I am aware that in Merrit v. Parker 1 *Coxe (N.J.)
R.*, Chief Justice KINSEY denied these principles,
and held that by no contrivance and under no
pretence can one man cause to flow over the
land of another a greater quantity of water than
it is naturally subjected to; but on the other
hand there is a Maryland case of equal authority,
Williams v. Gale, 3 *H. & John. R.* 231, which, in

its facts, bears a striking resemblance to the case at bar, and the case of Martin v. Riddle, decided by my Brother LOWRIE, in the District Court of Allegheny county, and affirmed in the Supreme Court at September Term, 1848. *These cases recognise the principle that the superior owner may improve his lands by throwing increased waters upon his inferior through the natural and customary channels, which is a most important principle in respect not only to agricultural, but to mining operations also.*

*Id.* at 413-14 (Emphasis added.)

This lengthy quote from such an early Pennsylvania decision is necessary because it is the wellspring from which both the majority and concurring viewpoints arise, and because it demonstrates that the *Kauffman* court never articulated the "natural flow" doctrine of surface water law, which emanated from the Civil Code, without at the same time modifying it, and intermingling it with, the common law "reasonable use" doctrine of surface water law. Theoretically, there are three doctrines of surface water law that can be applied to surface waters;[1] the civil law rule or "natural flow" theory; the common law rule or "reasonable use" theory; and the "common enemy" rule.[2] The common enemy rule

---

[1] The term "surface water" means water from rain, melting snow, springs, or seepage, or detached from subsiding floods, that lies or flows on the surface of the earth but does *not* form a part of a watercourse or lake. Restatement (Second) of Torts §846 (1977).

[2] "All three doctrines developed in the nineteenth century when nonagricultural land development was increasing. *The Flow of Surface Water Law in Connecticut,* 14 Conn. L. Rev. 601, 609 (1981-1982). For a discussion of the three surface water doctrines, see Note, Surface Water Drainage, 36 Notre Dame Law 518 (1960-61); Hands, Kinyon & McClure, Interferences with Surface Waters, 24 Minn. L. Rev. 891 (1940). For a discussion of jurisdictions applying the three doctrines, see 93 A.L.R. 3d 1193 (Supp. 1983)."

has only limited application in Pennsylvania, and only in an urban setting. *See e.g., Chamberlin v. Ciaffoni,* 373 Pa. 430, 96 A.2d 140 (1953); *LaForm v. Bethlehem Township,* 346 Pa. Superior Ct. 512, 499 A.2d 1373 (1985). The former two doctrines are variations of the general riparian law developed in states fairly rich in water resources—that is, those states in the eastern portion of the United States.[3] They are theoretically totally distinct doctrines.

Under the "natural flow" theory, as applied to a watercourse,[4] a riparian owner is "entitled to the natural flow of the water of the running stream through or along his land, in its accustomed channel, undiminished in quantity and unimpaired in quality," *Dimmock v. City of New London,* 157 Conn. 9, 245 A.2d 569, 572 (1968), and is much more limited than the right of a riparian owner under the "reasonable use" theory where every riparian owner can conduct reasonable uses even though they may affect the natural flow of water. *See generally* Restatement (Second) of Torts (Scope Note to Topic 3, 210-13) (1977); Butler, *Allocating Consumptive Water Rights in a Riparian Jurisdiction: Defining the*

---

*Waters and Water Courses-Torts-Owners of Property Damaged by Unlawful Ditching or Unreasonable Discharge of Waters May Obtain Relief by Statute or the Tort Concept of Reasonable Use,* 60 N.D.L. Rev. 741, 742 n.11 (1985)

[3] A "prior appropriation" doctrine, a system basically awarding a superior right to use water to the party who first appropriates or exercises dominion over the water for a beneficial use, has developed in the drier parts of the country, *i.e.,* the western states. Butler, *Allocating Consumptive Water Rights in a Riparian Jurisdiction: Defining the Relationship Between Public and Private Interests,* 47 U. Pitt. L. Rev. 95, 102 n.13 (1985).

[4] The term "watercourse" means a stream of water of natural origin, flowing constantly or recurrently on the surface of the earth in a reasonably definite natural channel. Restatement (Second) of Torts §841(1) (1977).

*Relationship Between Public and Private Interests,* 47
U. Pitt. L. Rev. 95, 102 n. 13 (1986).

Legal writers have noted that Pennsylvania was the
first common law jurisdiction to apply the civil law rule
in *Martin v. Riddle,* 26 Pa. 415 (1856) and Justice
WOODWARD in *Kauffman,* approved the following lan-
guage of Judge LOWRIE in *Martin* in his charge to the
jury:

> The question of the rights of the parties is a very
> interesting one, but not at all difficult of deter-
> mination; for it is governed by principles which
> recommend themselves to the common sense of
> every man.
>
> The right which every man has to the reasonable
> use of running streams passing through his land,
> for irrigation, watering cattle, driving machinery,
> and for other domestic, agricultural, and manu-
> facturing purposes, is well understood, and, on
> account of its correspondence with the indica-
> tions of nature, is seldom disputed in its princi-
> ples. It is a right, in the enjoyment of which a
> reasonable regard must always be had to the
> rights of others. On the other hand—as are our
> rights, so are our duties. We claim the use of
> running waters according to the order of nature
> where it is found for our benefit, and the same
> order requires us to bear the inconvenience of
> them when they are injurious.
>
> . . . .
>
> I shall speak now of the general principles of the
> law in the manner of rain water and drainage,
> and of the respective rights and duties of the
> adjoining proprietors in relation thereto. They
> are in general the same as in the case of running
> water—they follow nature. Not readily finding
> the subject treated of in any of our usual books

of reference, I venture to extract the law from books of foreign origin—*Corp. Jur. Civ.* 39, 3, 1, and 43, 21: *Code Nap.* sec. 640; *Poth. du Voisinage.*

*Id.* at 416. We should specifically note that both *Kauffman* and *Martin* concerned quarrels over *agricultural* land in a predominantly agrarian society; that in both the issue of damages was submitted to a jury; and, most important for our purposes, that intermingled with the articulation of the natural flow doctrine of law were superimposed theories of modification under the reasonable use doctrine.

Therefore, I would conclude, contrary to the majority, that since there has been no permanent injury suffered by the plaintiffs here, (nor, by the explicit finding of the trial judge, are they threatened by an irreparable harm) PECO should not be enjoined under the strict application of the natural flow theory of surface water law from discharging additional waters into the East Branch of the Perkiomen Creek.

The natural flow theory has been criticized by some commentators for its failure to take into account technological change, as well as its harshness and inflexibility, *See* Hands, Kinyon & McClure, *Interferences with Surface Water,* 24 Minn. L. Rev. 891, 913 (1940); *Waters and Water Courses—Torts—Owners of Property Damaged by Unlawful Ditching or Unreasonable Discharge of Waters May Obtain Relief by Statute or the Tort Concept of Reasonable Use,* 60 N.D.L. Rev. 741, 743 (1984), and the Restatement in the Scope Note to Topic 3—Interference with the Use of Watercourses and Lakes by Use of Water, comments:

In the early days of the Industrial Revolution when many mills and factories were powered by water, the doctrine served a very utilitarian purpose as it passed the water down from one mill

dam to the next. In today's economy it is not utilitarian and prohibits many beneficial uses of water although those uses may be causing no one any harm and although the water would run to waste if not so used.

There exist today many uses—such as sewage treatment plants, water purification plants and perhaps some farming operations—that would not be allowed to discharge water essential to their operation, but not natural to the property under the majority opinion. The result of such a strict principle of law would be to allow riparian owners downstream from such uses to enjoin them, even though these downstream owners have not been harmed by the introduction of these artificial waters. Such a rule of law, I believe, would wreak havoc upon the orderly administration of public affairs with no corresponding benefit to the public. It is interesting to note that in all of the cases cited by the majority the actions were brought because of an injury or for *damages* incurred by the particular landowner/plaintiff in each case. Here, by contrast, there is absolutely no showing that any injury will be done to the Appellants' land. Indeed, the evidence suggests the contrary. *Del-AWARE/DER*.

Neither is this a case of strict liability where an upper riparian owner has changed the course of a stream or diverted water from its ordinary channel, *see e.g., McCormick Coal Co., Inc. v. Schubert,* 379 Pa. 309, 108 A.2d 723 (1954). Unless we are prepared to enjoin *every* discharge of unnatural water into a stream bed based upon the concept of strict *property* law (*i.e.* easement), then the principles we should apply should be based upon tort law and the Latin maxim used in *McCormick,* "sic utere tuo ut alienum non laedas"; "use your own property in such a manner as not to injure that of another."

Furthermore, limiting absolutely the right of the flowage easement either to waters originating on the land of the upper riparian owner or to waters which would enhance the use of the upper riparian property, is, I believe, an unnecessary restriction under the reasonable use theory and is without legal precedent. Such a restriction would preclude a municipal sewer authority from discharging its unpolluted waste water into a watercourse through an easement secured by condemnation; would most likely prohibit commercial and industrial enterprises from discharging water into watercourses unless coupled with the additional nexus of land use, or "enhancement of the riparian land itself"; and would most assuredly prevent the transmission of the waters from the Delaware River, through the north branch transmission main, *along the North Branch of the Neshaminy Creek* for use as a public water supply by the North Penn (NP) and North Wales (NW) Water Authorities. *See Del-AWARE/PUC; Del-AWARE/DER; Sullivan.* There is some justification, of course, for a doctrine that would restrict the definition of riparian land to that which lies within the confines of a natural watershed on the basis that it would ensure that any water that was *withdrawn for consumption* but not fully used would remain within the watershed and would thus return to the watercourse for use by other riparians in that watershed. *See* Butler, *supra* at 111. But here, PECO is not a *consumptive* user of the waters of *the Perkiomen Creek;* if anything, PECO would be a consumptive user of the waters in the *Delaware River Watershed,* and an upper riparian owner to the lower riparians on the *Schuylkill River.*

We can take judicial notice of the geography of the area which lies between the Point Pleasant pumping station on the upper Delaware River and PECO's Limerick Generating Station just southeast of Pottstown on

the Schuylkill River. We can also reasonably infer that PECO's public utility service area for the supply of electricity lies at least between those two points and encompasses all or parts of Chester, Montgomery, Bucks, Delaware and Philadelphia counties. We also know that PECO's application has secured the approval of the Delaware River Basin Commission, the regulatory agency for the water resources of the *Delaware River Basin,* which includes "the area of drainage into the Delaware River *and its tributaries*" Section 1.2(a) of the Delaware River Basin Compact, Act of July 7, 1961, P.L. 518, *as amended,* 32 P.S. §815.101[5] which therefore would include the Schuylkill River and its tributary, the Perkiomen Creek, as well as the Delaware River itself and its tributaries, *i.e.,* the Neshaminy Creek and the Schuylkill River. While the Neshaminy Creek is a navigable watercourse under the jurisdiction of the Department of the Army, Corps of Engineers, *see* Lynch, *Riparian Title in Pennsylvania,* 41 Pa. B.Q. 224, 233-35 (1970) (Appendix II), there seems to me no logical reason requiring a distinction between the use of the East Branch of the Perkiomen Creek as a factor in the supplying of electric power to the population of the region, and an identical use of the North Branch of the Neshaminy Creek to supply part of the region with its public water supply.

Accordingly, I would affirm the judgment of the trial court.

---

[5] The Delaware River Basin Compact between the United States and the States of Delaware, New Jersey, New York and Pennsylvania was constructed and framed to meet the demands of a population projected to reach 40 million people by the year 2010 and to preserve the water resources of the Delaware River Basin, acknowledging in its preamble that these "water resources are functionally interrelated and the uses of these resources are interdependent." Article I of the Compact, 32 P.S. §815.101.